187 N.J. Super. 435 (1982)
455 A.2d 493
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
JOSEPH P. BRUZZESE, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued June 1, 1982.
Decided August 27, 1982.
*436 Before Judges MILMED, JOELSON and GAULKIN.
Frank D. DeVito, Assistant Union County Prosecutor, argued the cause for appellant (John H. Stamler, Union County Prosecutor, attorney).
Anthony D. Rinaldo, Jr., argued the cause for respondent (Rinaldo & Rinaldo, attorneys; Gerald J. Martin, on the brief).
The opinion of the court was delivered by GAULKIN, J.A.D.
*437 The State appeals by leave granted (R. 2:2-4) from an order suppressing a pair of boots seized as evidence upon the arrest of defendant at his home.
The operative facts are not disputed. During the early course of an investigation into an apparent burglary at Madan Plastics, Inc. in Cranford on November 12, 1980, the Cranford police received information which led them to regard defendant as a suspect in the crime. The investigation had also produced a rear door panel from the property entered, which bore what Cranford Detective Hicks described as the impression of a shoe sole bearing a unique diamond pattern. Armed with that information, Detective Hicks did "some checking on the defendant to check on his past history," which uncovered "an active warrant in Cranford for contempt of court." Since defendant resided in the adjoining municipality of Roselle Park, Hicks called the Roselle Park police and told them that "I'd like to go to his residence ... and pick the defendant up on the warrant itself."
On November 14 Hicks, together with another Cranford officer and two Roselle Park officers, went to defendant's home. Two of the officers went to the back door and two presented themselves at the front door, which was opened by defendant's aunt. The officers told her that "we wanted to speak to Joe," whereupon she went upstairs and shortly thereafter defendant came downstairs. Hicks told defendant that he was from the Cranford Police Department and that he "held a contempt warrant out of the Cranford Municipal Court and that I was there to pick him up on that particular warrant." Defendant said he needed to get dressed and proceeded upstairs. Without invitation or request, Hicks and another officer "accompanied him up to his bedroom," where defendant put on a shirt and a pair of shoes. In the bedroom Hicks "noticed a pair of black work boots below the dresser"; he picked up one of the boots and examined it:

*438 And to me at that time I felt that that was the same sole impression that I had seen on the door panel up at Madan Plastics.
........
I picked the boots up, and I told Joe at the time I was taking the boots with me, and he wanted to know why. And not to aggravate anything at that particular time, I just told him that when we got into our headquarters I would explain to him why I seized the boots.
At the hearing of the suppression motion, Detective Hicks said his intent in proceeding as he did was "two fold; one, that we had a warrant for his arrest, and the other was I wanted to speak to him about the burglary due to the fact that he was a suspect." When later asked whether he went to defendant's house "to see whether or not you could find any shoes to match up with the investigation," Hicks frankly acknowledged "that was in the back of my mind, yes, it was." He continued that "I needed to speak to him" and that making the arrest on the contempt warrant "was the easiest way for us to pick him up and talk to him, yes." But Hicks conceded that his work did not normally entail "contempt followups"; that defendant's criminal record check had shown only "minor disorderlies" and, furthermore, that "normal" procedure in handling contempt warrants is not to arrest but to call the person by telephone and ask him to appear at headquarters.
In the trial court counsel for defendant relied principally on State v. Seiss, 168 N.J. Super. 269 (App.Div. 1979), and argued that Hicks resorted to the contempt warrant with the "ulterior motive" to "go in there and look around and perhaps get lucky." The State acknowledged the authority of Seiss, but argued that there was a "substantial police need" to accompany defendant to his bedroom in connection with the arrest. The State also sought to justify the seizure as the product of a search incident to the arrest. The trial judge found Seiss essentially dispositive. Although he accepted that the officers had gone to defendant's home "for the purpose of arresting the defendant," he found that "they were hopeful of finding some evidence to add to whatever they had in connection with the burglary at Madan *439 Plastics." The trial judge framed the "plain view" issue in terms of "whether this was the result of an inadvertent viewing by the police" or whether "it was a purposeful inspection for investigative purposes." His conclusion was that
... their entire conduct in entering this house, if limited to what they were there for, which was the contempt, would have and should have begun and ended with the defendant going upstairs, coming downstairs and going with them.
Accordingly, the trial judge ordered the suppression of the boots as evidence.

I
In State v. Seiss, supra, this court suppressed evidence found in "plain view" when police officers entered defendant's home to arrest him for nonpayment of a fine on a motor vehicle charge. Judge Lynch noted that the police may enter a home to effect an arrest, but that such an entry "is to be measured by the rule of reasonableness." 168 N.J. Super. at 273. The rule of reasonableness, it was explained,
... has recently been refined to a dual standard of (1) whether the police acted in good faith in making a search incident to a lawful arrest and (2) whether there existed a "substantial police need" for the action they have taken. State v. Slockbower, 79 N.J. 1 (1979); State v. Ercolano, 79 N.J. 25 (1979). In other words, if a search is unnecessary for the attainment of a lawful police objective, it is illegal." [Ibid.]
Finding that "the officers had no such reason to believe that he might escape," the court concluded that the "plain view" observation made within the house was improper because "there was no `substantial necessity' to enter defendant's home in order to arrest him." Id. at 274. "Rather," the court found, "it appears the police invaded defendant's home merely for the purpose of conducting an exploratory search." Id. at 276.
On its face the Seiss holding would be dispositive here, as it was found to be by the trial judge. Here, too, the arrest effected was for a relatively minor offense unrelated to that for which the evidence was seized; defendant was cooperative and there was no showing that the police reasonably apprehended that he would seek to escape or arm himself when he went *440 upstairs to get dressed[1], and therefore it was unnecessary for the effecting of the arrest to follow defendant through the interior of his home.
The State, however, argues that the holding of Seiss is substantially diluted, if not entirely negated, by the later decision of the United States Supreme Court in Washington v. Chrisman, 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982), which held that regardless of "the nature of the offense" for which an arrest is made, an arresting officer has "a right to remain literally at [a defendant's] elbow at all times; nothing in the Fourth Amendment is to the contrary." We recognize and, of course, accept that ruling[2], but we do not regard it as validating the asserted "plain view" seizure which occurred here.
We must start with the recognition that not every "plain view" observation permits the warrantless seizure of the item observed. See, generally, State v. O'Herron, 153 N.J. Super. 570 (App.Div. 1977), cert. den. 439 U.S. 1032, 99 S.Ct. 637, 58 L.Ed.2d 695 (1978). The rule is, rather, that
... a warrantless seizure may be made of items in "plain view" in a location where the officer has a right to be; but that the presence of the items cannot alone supply justification for a police officer's presence at that location. [Id. at 575].
Whether an officer "has a right to be" where the items are observed turns, of course, on the manner in which the intrusion into that location was made. Thus, for example, if the intrusion is itself unlawful, any evidence seized in "plain view" as a result must be suppressed. Id. at 574; State v. Rice, 115 N.J. Super. 128 (App.Div. 1971).
*441 In Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), the court identified another kind of intrusion which will not support a seizure of "plain view" items. In his plurality opinion Justice Stewart said that to sustain a warrantless "plain view" seizure "the discovery of evidence in plain view must be inadvertent."[3] 403 U.S. at 469, 91 S.Ct. at 2040. His stated concern was to deny validity to a "planned warrantless seizure," which he described as one effected by the police "maneuvering themselves within `plain view' of the object they want." Ibid., n. 26. Observing that "this court has never permitted the legitimation of a planned warrantless seizure on plain view grounds" (Id. at 471, n. 27) 91 S.Ct. at 2041 n. 27, Justice Stewart found that an initial intrusion into a constitutionally protected area may be entirely lawful but will still not extend
... to the seizure of objects  not contraband nor stolen nor dangerous in themselves  which the police know in advance they will find in plain view and intend to seize.... [403 U.S. at 471, 91 S.Ct. at 2040]
The contrary view, Justice Stewart reasoned, would be to conclude that the "warrant requirement should be ignored whenever the seizing officers are able to arrange to make an arrest within sight of the object they are after." Ibid., n. 27.
We read the present record, and the conclusions of the trial judge, to establish that the seizure here was just such a "planned warrantless seizure." The police used a most anomalous procedure to effect an arrest in an adjoining town on a minor charge; an expressed reason for executing the contempt warrant by arrest was that defendant was a suspect in an entirely unrelated burglary and that "we wanted to talk to him"; the officer "had in the back of my mind" that he might find the footgear to match the only physical evidence he had from that burglary; at the time of the arrest there was no *442 suggestion that defendant was angry or exercised, likely to become violent or to escape, and the police, without advising defendant of their plan to "talk to him" concerning the burglary, followed him without invitation into his own bedroom where they made the hoped-for "plain view" observation. Those facts fully support the finding of the trial judge that the arrest and seizure went well beyond what could reasonably be attributed to an intent to arrest defendant on a contempt warrant; in these circumstances the conduct of the police in arresting defendant and remaining at his elbow must realistically be seen as a pretext to obtain a view of the interior of his house and, as it fortuitously worked out, to make a "plain view" seizure. This kind of improper police procedure was specifically envisioned in "The Supreme Court, 1970 Term," 85 Harv.L.Rev. 3 (1971):
... where the police have probable cause to arrest, their best strategy is to defer arrest until the suspect is at home so that they have a chance of discovering evidence in plain view which they would not have had if they made their arrest elsewhere. This use of the arrest power for the ulterior purpose of gaining access to a person's house amounts to a planned warrantless search and seems at the heart of Justice Stewart's concern. [Id. at 245]
Application of these principles is well illustrated in Harding v. State, 301 So.2d 513 (Fla.App. 1974), cert. den. 314 So.2d 151 (Fla.Sup.Ct. 1975). There deputy sheriffs learned that one, Hardison, could be found at Harding's home, although they were not looking for Hardison, they did know him to be involved in "the local drug scene" and concluded that "it would be a good bet" that there would be drugs in his possession. The deputy sheriffs learned that Hardison had two minor traffic arrest warrants outstanding and, without advising the local police, they went to Harding's home. They announced their purpose to arrest Hardison, gained entry to the house and arrested him; Harding then happened to enter the house carrying in "plain view" the marijuana which was the subject matter of the motion to suppress.
In reversing the trial court's denial of the motion to suppress, the Court of Appeal noted that none of the deputy sheriffs was "normally engaged in executing municipal traffic warrants"; that it was "most unusual" for deputy sheriffs to serve city *443 traffic warrants; that the arrest therefore could not be characterized as one accomplished by a deputy sheriff "routinely acting in reasonable pursuit of his usual and normal duties," and that the arrest and seizure occurred "without any pretense of necessity or without any suggestion of exigent circumstances." Id. at 514-515. Based upon those considerations the Court of Appeal concluded that the arrest warrants
... were used as an excuse to scavenge for contraband and on such a predicate the plain sight seizure from Harding, the owner of the invaded home, was unreasonable, that is to say, fatally pretextual in violation of his rights under the Federal and State Constitutions relating to unreasonable searches and seizures. [Id. at 514]
We find this holding and its reasoning to be fully consistent with Coolidge and persuasive in the present setting.[4] Although our research does not disclose any published New Jersey opinions involving a fact pattern such as presented here, we do note that recent New Jersey cases have recognized, in cognate settings, that the intent of police officers may be determinative of the validity of their arrests and seizures and that the "true facts" must prevail over the "objective facts." See State v. Ercolano, supra 79 N.J. at 39.
In Ercolano the court held invalid what was claimed by the police to be an inventory search of an automobile. Judge Conford, speaking for the court, noted (at 38) that "[t]he intent and purpose of the police in conducting a search has frequently been held material to the validity thereof." He recited with approval the holding of Jones v. United States, 357 U.S. 493, 500, *444 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958), that although government agents could lawfully have entered a house with intent to arrest a defendant and thereby legally seize illicit equipment in plain view, nevertheless the seizure there was invalid because the court found "their purpose in entering was to search for distilling equipment and not to arrest petitioner"; therefore, Judge Conford recounted, "[t]he actual intent of the officers was regarded as fatal to the search as a matter of law." 79 N.J. at 39. Based upon that and other authorities, Judge Conford found that "the principle that the intent and purpose of the searching officers may be material, indeed crucial, to the validity of the search, is fully applicable here." Ibid.
Similarly, in State v. Slockbower, supra, our Supreme Court found, as one ground for "condemning" what was sought to be justified as an inventory search upon impoundment of an automobile, that "the purported impoundment was pretextual" and therefore that there was not "substantial necessity" for the impoundment. 79 N.J. at 13. And in State v. Seiss, supra, the conclusion that there was no "substantial necessity" to enter defendant's house was based, as already recited, upon the court's finding that "it appears the police invaded defendant's home merely for the purpose of conducting an exploratory search." 168 N.J. Super. at 274-276. These cases are but exemplars of the broadly accepted view that "bad faith" searches or seizures are unconstitutional even though they may appear to be objectively constitutional. See, generally, Burkoff, "Bad Faith Searches", 57 N.Y.U.L.Rev. 70 (1982); Amsterdam, "Perspectives on the Fourth Amendment," 58 Minn.L.Rev. 349 (1974).

II
Our finding of the invalidity of the alleged "plain view" seizure is equally dispositive of the State's alternate contention that the seizure here was the product of a search incident to arrest. Not only did the officers testify that they did not conduct a search at all, but a search conducted upon the pretextual *445 arrest would also be invalid under the authorities already cited. See, generally, Burkoff, "Bad Faith Searches," supra.

III
In reaching our conclusions we have not overlooked Scott v. United States, 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), reh. den. 438 U.S. 908, 98 S.Ct. 3127, 57 L.Ed.2d 1150 (1978), in which Justice Rehnquist, speaking for the court, described certain earlier precedents as holding that searches are to be evaluated "under a standard of objective reasonableness without regard to the underlying intent or motivation of the officers involved." Id. at 138, 98 S.Ct. at 1723. The accuracy of that recitation, however, as well as the application of the Scott holding, has been the subject of considerable dispute. See, e.g., Burkoff, "Bad Faith Searches," supra, 57 N.Y.U.L.Rev. at 72-84; 1 LaFave, Search and Seizure (Cum.Supp.), § 1.2 at 4-19 (1978). We do not read Scott to overrule Coolidge or to require any retreat from the principles enunciated by our court in State v. Ercolano and State v. Slockbower, both supra.
Moreover, we find that the seizure here would be vulnerable even in the absence of a finding of subjective bad faith or pretext. As Professor LaFave has pointed out (Search and Seizure, supra (Cum.Supp.), § 1.2 at 17), the United States Supreme Court has recognized in a number of settings that "arbitrary action is unreasonable under the Fourth Amendment"; therefore it is surely approprite to consider, in a case of this nature, whether the officer deviated from usual police practice, even if we disregard why he did so.
It is the fact of the departure from the accepted way of handling such cases which makes the officer's conduct arbitrary, and it is the arbitrariness which in this context constitutes the Fourth Amendment violation.... [Id. at 16]
LaFave suggests, as an alternative to an examination of "the underlying intent or motivation of the officers involved," that the courts "ascertain in a more direct fashion whether the police in the particular case had departed from their usual practice." Id. at 18. He suggests, in short, "more widespread application *446 of the requirement utilized by the Supreme Court in South Dakota v. Opperman, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), namely that the Fourth Amendment activity `was carried out in accordance with standard procedures in the local police department.'" Ibid. Application of that rationale would require suppression of the evidence seized here since it is acknowledged that the arrest, whether or not characterized as subjectively "pretextual," was not effected in accordance with "normal" procedures in the local police department. The seizure can fairly be characterized as the product of arbitrary police activity and thus in violation both of the Fourth Amendment and of N.J. Const. (1947), Art. I, par. 7.

IV
We have carefully considered the contrary views expressed by our dissenting colleague. Our conclusion, however, is that his analysis overlooks the "true facts" realistically perceived by the trial judge and, further, that it fails to give proper recognition to the case law which condemns pretextual or arbitrary police searches. On the record before us and in light of the trial judge's findings and the reasoning and authority above recited, we determine that the observation and seizure of the boots, although ostensibly valid, were in fact pretextual and arbitrary and accordingly were in violation of the Fourth Amendment and the parallel provision of our New Jersey Constitution. The evidence was therefore properly suppressed by the trial court.
The July 10, 1981 order appealed from is affirmed.
JOELSON, J.A.D. (concurring).
I share my dissenting colleague's unwillingness to "deter police officers generally from exercising logical and appropriate rights and initiatives in their pursuit of effective law enforcement." Further, I suggest that under the circumstances of this case, it would have been both logical and appropriate for the police to have exercised their rights and initiatives legally by *447 applying for a search warrant as required by the Fourth Amendment rather than engage in their contrived subterfuge.
In accepting the testimony of the detective that he went to defendant's Roselle Park home in order to execute the warrant for defendant's arrest for contempt and to interrogate him about the Cranford burglary, my dissenting colleague brushes aside the detective's apparent planned disregard of defendant's rights to receive his Miranda warnings. However, even assuming, arguendo, that the police legally entered defendant's home in order to arrest him on the previously slumbering warrant, there is some doubt that the seizure of the boots can be upheld under the "plain view" doctrine. Although the work boots were concededly plainly visible, they may not have been in plain view as incriminating evidence of the commission of a crime. Only after the police picked them up, turned them over, and inspected their soles did it become apparent that the boots constituted such evidence. At any rate, the alacrity with which the police did so illuminates glaringly their true reason for being at defendant's home in the first place. If any further proof of their real purpose is needed, it can be found in the testimony of defendant, referred to in footnote 5 of the dissenting opinion, that the detective and an accompanying Roselle Park police officer had "looked under the bed, behind the TV, just looking around, you know." Since the trial judge found that the witnesses "on both sides" had been "honest" and "candid", defendant's testimony in this respect should not be ignored.
MILMED, P.J.A.D. (dissenting).
I cannot agree with my colleagues' strained reasoning. If allowed to stand, it surely would deter police officers generally from exercising logical and appropriate rights and initiatives in their pursuit of effective law enforcement.
First, let us put the facts in their proper perspective. Three witnesses testified at the suppression hearing  Detective John M. Hicks, of the Cranford Police Department, for the State, and *448 defendant Joseph P. Bruzzese and his aunt Vinnie Schuha in support of the motion to suppress. At the conclusion of the testimony the trial judge observed that he had "the strong feeling in this case that all of the witnesses on both sides have been honest witnesses, so to speak, candid." In the context of this evaluation, the relevant facts may be briefly summarized.
On November 12, 1980 a burglary and theft allegedly occurred at the premises of Madan Plastics on North Avenue in Cranford. In the ensuing police investigation conducted by Detective Hicks and other police officers, defendant's "name came up as a suspect."[1] Hicks testified that from conversations with other police officers and from official reports he had learned that defendant was a former employee of Madan Plastics and "the night before this alleged burglary took place he was at someone's house in Cranford ... and prior to his leaving, he stated that he was going to get even with the people at Madan Plastics for firing him." He also learned that defendant walked home that night and that he lived about a quarter of a mile from the Madan Plastics establishment.
Hicks "viewed latent fingerprints that were taken from the scene, and ... a panel which was taken from one of the rear doors." The panel had a "unique" sole impression on it. As Hicks described it,
... It was a full sole impression on the door panel itself, which had a diamond pattern in the center on the sole, and the heel had holes which appeared to be nail holes all the way around the circumference of the heel. And around these holes were other holes where the nails went in.
He "couldn't tell from the imprint on this panel," however, whether it was "made with black boots or brown boots or white boots."
Upon checking into defendant's "past history" Hicks discovered that there was an outstanding warrant for defendant's arrest for contempt of court, for failure to appear, issued out of the *449 Cranford Municipal Court. Thereupon, he contacted the Roselle Park Police Department and "told them [he would] like to go to [defendant's] residence [in] Roselle Park, and pick the defendant up on the warrant itself." He spoke with Officer Thomas Mayer of the Roselle Park Police Department, who was familiar with defendant. On November 14, less than 36 hours after the alleged burglary at Madan Plastics, Detective Hicks, armed with the information regarding defendant's possible involvement, proceeded to defendant's residence accompanied by Officer Mayer, who was in uniform, Officer Jenkins, also of the Roselle Park Police Department, and Officer Michael Cavalla of the Cranford Police Department. Hicks explained that Patrolman Mayer went along because he had "had dealings with [defendant] in the past, in that [defendant] had tendencies of becoming violent with the police." Hicks also explained why he went to defendant's home at the time, stating: "My reasons were twofold; one, that we had a warrant for his arrest, and the other was I wanted to speak to him about the burglary due to the fact that he was a suspect."[2]
Upon arriving at the premises Hicks and Patrolman Mayer went to the front door[3] and rang the door bell. Defendant's aunt, Vinnie Schuha, who lived there with her sister and nephew *450 (the defendant), responded. The officers identified themselves and told her they "wanted to speak to Joe [defendant]." She asked them "inside the house" and then "went upstairs to the second floor of the residence, came down, and Joe was behind her." Detective Hicks immediately identified himself, informed defendant of the outstanding arrest warrant, placed him under arrest, and told him he was going to be taken to Cranford.[4]
Defendant, dressed in pants and a shirt, told the officers that they had just awakened him and that he wanted to go upstairs to get some shoes and a jacket. He told them to wait downstairs "while I go upstairs and put on my shoes and grab a coat." His aunt testified that she heard defendant tell Detective Hicks "to wait downstairs, he'd be right down," but that Hicks said "I'll have to go upstairs with you." When defendant turned around and went upstairs, the two officers, Hicks and Mayer, "accompanied him up to his bedroom." Hicks explained that "one of the reasons" for accompanying defendant was "the fact that ... he had a history of violence." The detective also described what occurred upstairs:
We went upstairs to the bedroom, and Joe proceeded to get dressed, put [another] shirt on, he put on a pair of shoes. He walked over to his dresser to get some money to pay for the bail. And while he was at the dresser, I noticed a pair of black work boots below the dresser.[5] I reached down, picked up one of *451 the boots.[6] I looked at the sole impression on the boot. And to me at that time I felt that that was the same sole impression that I had seen on the door panel up at Madan Plastics.
........
I picked the boots up, and I told Joe at the time I was taking the boots with me, and he wanted to know why. And not to aggravate anything at that particular time, I just told him that when we got into our headquarters I would explain to him why I seized the boots.
At the Cranford police headquarters Hicks, after comparing the soles of the boots with the impression on the door panel from Madan Plastics, informed defendant that he "had a confirmation that the boots matched up with the impression on the panel." Upon being asked for a statement, defendant gave him an "admission."[7]
At the conclusion of the hearing the trial judge held that whether the boots were entirely or partially in plain view, their seizure by the police "would have to fall ... because this was not plain view where the police had a right to be." He prefaced this holding by commenting:
It seems clear to me the police were hopeful of finding some evidence to add to whatever they had in connection with the burglary at Madan Plastics and their entire conduct in entering this house, if limited to what they were there for, which was the contempt, would have and should have begun and ended with the defendant going upstairs, coming downstairs and going with them.

*452 The Lawful Arrest
My colleagues suggest that Detective Hicks had no right to go to defendant's residence to arrest him on the outstanding warrant for contempt of court; that defendant should rather have been called "by telephone" and asked "to appear at headquarters." There surely is no mandate, constitutional, statutory, or otherwise, that execution of an arrest warrant, of whatever nature, be preceded by a courtesy call to the person to be arrested asking that he voluntarily turn himself in at headquarters. Beyond this, there is nothing in the record to warrant the majority's characterization of the procedure used to effect the arrest of defendant as "most anomalous." Actually, the procedure used was entirely lawful and appropriate in the circumstances. Here, the police had information from an employee at Madan Plastics which made defendant, a discharged employee of the establishment, a prime suspect in the burglary. This being so, it was apparently obvious to Detective Hicks, as it would have been to any alert investigative officer in the same situation, that defendant should be picked up and brought to Cranford for delivery pursuant to the arrest warrant, see N.J.S.A. 2A:10-8, and for questioning about the break-in. Hicks expressed his intentions clearly:
... due to the fact that there was a warrant and I needed to speak to him, we did go there with the warrant to pick him up.

........
It was the easiest way for us to pick him up and talk to him.

........
When he [defendant] came downstairs [the first time], I made him aware of the fact that we had an arrest warrant for him; and I told him that he was going to be arrested and accompany us back to Cranford. [Emphasis supplied]
State v. Seiss, 168 N.J. Super. 269 (App.Div. 1979), relied upon heavily by my colleagues and the trial judge, is obviously inapposite. There, "the police invaded defendant's home merely for the purposes of conducting an exploratory search." Id. at 276. Here, the clear objective of the police was to take defendant into custody on the outstanding arrest warrant, deliver him *453 to Cranford pursuant thereto and "talk to him" regarding the burglary at Madan Plastics. That "technique" did not render the initial arrest on the warrant invalid nor any incriminating evidence properly resulting therefrom inadmissible. See United States v. Atkinson, 450 F.2d 835, 840 (5 Cir.1971), cert. den. 406 U.S. 923, 92 S.Ct. 1790, 32 L.Ed.2d 123 (1972).[8]

The Lawful Seizure of the Incriminating Boots
There is nothing in the record to suggest that the police, in going to defendant's residence, had planned a random search of the premises. Their expressed purpose was to arrest defendant on the outstanding warrant and bring him back to Cranford. If, after being arrested and being told that an officer would have to follow him upstairs, defendant had asked his aunt to go upstairs and bring down whatever he wanted from his bedroom, the inculpatory evidence would not then have been discovered by the police. Defendant would have been taken in custody to Cranford without first leading the police to his bedroom, and the officers would thus not have been in any position to observe the incriminating boots which were there in plain view.
Here, following his arrest on the outstanding warrant, defendant chose to return to his room after being informed by Detective Hicks that if he did so the officer would have to go with him. In the circumstances, the detective "had a right to remain literally at [defendant's] elbow at all times; nothing in the Fourth Amendment is to the contrary." Washington v. Chrisman, 455 U.S. 1, 6, 102 S.Ct. 812, 816, 70 L.Ed.2d 778, 785 (1982).
... The absence of an affirmative indication that an arrested person might have a weapon available or might attempt to escape does not diminish the arresting officer's authority to maintain custody over the arrested person. See Pennsylvania v Mimms, 434 US 106, 109-110, 54 L Ed 2d 331, 98 S Ct 330 *454 [332-333] (1977); United States v Robinson, 414 US 218, 234-236, 38 L Ed 2d 427, 94 S Ct 467 [476-477], 66 Ohio Ops 2d 202 (1974). Nor is that authority altered by the nature of the offense for which the arrest was made. [Id.]
The authority of the arresting officer to maintain custody over an arrested person is not something new  it is well embedded in the law. See, e.g., State v. Brown, 132 N.J. Super. 180, 184 (App.Div. 1975); United States v. DiStefano, 555 F.2d 1094, 1101 (2 Cir.1977); United States v. Broward, 594 F.2d 345, 350 (2 Cir.1979), cert. den. 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979); Commonwealth v. Davenport, 453 Pa. 235, 308 A.2d 85 (Sup.Ct. 1973).
Having the right "to monitor the movements" of defendant following the arrest, Washington v. Chrisman, supra, 455 U.S. at 7, 102 S.Ct. at 817, 70 L.Ed.2d at 785, Detective Hicks had the right to accompany defendant to his bedroom, as well as "the right to act as soon as he observed" the potentially incriminating evidence, id. 455 U.S. at 9, 102 S.Ct. at 818, 70 L.Ed.2d at 786, which, according to defendant himself, could be seen there "without looking under the dresser." Upon examining the boots and verifying their incriminating nature, the arresting officer had the right to seize them and bring them in as evidence in the burglary investigation.
... This is a classic instance of incriminating evidence found in plain view when a police officer, for unrelated but entirely legitimate reasons, obtains lawful access to an individual's area of privacy. The Fourth Amendment does not prohibit seizure of evidence of criminal conduct found in these circumstances. [Id. 455 U.S. at 9, 102 S.Ct. at 818, 70 L.Ed.2d at 786-787]
And see Coolidge v. New Hampshire, 403 U.S. 443, 465-466, 91 S.Ct. 2022, 2037-2038, 29 L.Ed.2d 564, 582-583 (1971); Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).
My colleagues' attempt to equate what happened in the case now before us with the "planned warrantless seizure" condemned by Justice Stewart in Coolidge v. New Hampshire, supra, is misguided. In Coolidge the police "knew the automobile's exact description and location well in advance; they intended to seize it [without a warrant] when they came upon Coolidge's property. 403 U.S. at 472, 91 S.Ct. at 2041, 29 L.Ed.2d 586-587. It was this kind of warrantless seizure, "where the *455 police know in advance the location of the evidence and intend to seize it," 403 U.S. at 470, 91 S.Ct. at 2040, 29 L.Ed.2d at 585, that furnished the basis for a plurality holding that the seizure of Coolidge's car was unconstitutional. 403 U.S. at 473, 91 S.Ct. at 2042, 29 L.Ed.2d at 587. In the case now before us there is not the slightest suggestion by anyone that Detective Hicks or any of the other officers knew in advance the location of the boots and intended to seize them when they came to arrest defendant. Cf. State v. Ercolano, 79 N.J. 25, 35 (1979). The record before us is clear. Hicks was at the premises to take defendant into custody on the outstanding arrest warrant and bring him back to Cranford. He made the arrest and, exercising "[h]is right to custodial control" over defendant, Washington v. Chrisman, supra, 455 U.S. at 8, 102 S.Ct. at 818, 70 L.Ed.2d at 786, accompanied defendant to the upstairs bedroom. While there he observed the suspected boots in plain view, examined them, and properly seized them upon verifying their incriminating nature. The seizure was clearly constitutional. The evidence was improperly suppressed.
I would reverse the July 10, 1981 order under review and remand the matter to the trial court for further proceedings not inconsistent with this opinion.
NOTES
[1] Detective Hicks did make a reference to a report that defendant "had tendencies of becoming violent with the police," but the trial judge gave that report no apparent weight.
[2] We need not here determine whether the more stringent standard of Seiss survives, notwithstanding Washington v. Chrisman, as an authoritative interpretation of N.J. Const. (1947), Art. I, par. 7.
[3] Although the discussion of inadvertence in Justice Stewart's plurality opinion was not joined in by a majority of the court, our own Supreme Court has treated the inadvertence requirement as part of the "plain view" doctrine. See, e.g., State v. Ercolano, supra, 79 N.J. at 35.
[4] We are aware of the variant views expressed both in case law and academic discussion concerning the point at which a police officer's expectation or suspicion renders his "plain view" observation no longer "inadvertent." Compare, e.g., United States v. Davis, 461 F.2d 1026, 1034-1035 (3 Cir.1972), with United States v. Liberti, 616 F.2d 34 (2 Cir.1980), cert. den. 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 808 (1980); see, generally, "The Supreme Court, 1970 Term," supra, 85 Harv.L.Rev. 244-247; Note, "`Inadvertence': The Increasingly Vestigial Prong of the Plain View Doctrine," 10 Memphis St.U.L.Rev. 399 (1980). We do not find it necessary to explore those niceties inasmuch as we find, from the totality of the facts recited, that the arrest here was entirely pretextual and the seizure planned.
[1] The information regarding defendant's possible involvement came from "another employee at Madan Plastics."
[2] At one point in the cross-examination of Detective Hicks, he was asked whether when he found out there was an arrest warrant outstanding against defendant for contempt of court he "could have called him on the phone and told him to come down to police headquarters...." He replied "I could have, yes."

At a later point in the cross-examination, the detective was asked, "wasn't one of the main reasons that you went out there was to see whether or not you could find any shoes to match up with the investigation?" He answered "[t]hat was in the back of my mind, yes, it was." He insisted, however, that "due to the fact that there was a warrant and I needed to speak to him, we did go there with the warrant to pick him up." He explained that "[i]t was the easiest way for us to pick him up and talk to him...."
[3] "Officer Cavalla and Officer Jenkins went to the back door of the residence."
[4] Answering the question, "When is the exact point that you placed the defendant under arrest?" Hicks testified: "At the time when he came down the stairs I notified him at that time we had an arrest warrant for him and he was under arrest and we were going to take him into Cranford."

Defendant agreed. He testified:
Q. When was the first time you knew you were under arrest?
A. When I was downstairs. When I first came down they says they were here to arrest me.
[5] Defendant testified:

Q. Could you see your boots without looking under the dresser?
A. Yes, you could.
He also said that the two officers had "looked under the bed, behind the TV, just looking around, you know."
[6] Defendant testified that at the time Detective Hicks picked up the boots, he [defendant] did not have his shoes on. He said he was "going to put [the boots] on" and "wear them to go outside."
[7] This testimony was elicited on cross-examination of Detective Hicks. The officer was then asked if he had said to defendant "that if he gave you a statement they'd let him out without posting any bail...." The prosecutor objected, at which point the trial judge noted that the hearing being conducted was "not a Miranda hearing as to the voluntariness of any statement...." Counsel for defendant responded:

The reason we're bringing it out, your Honor, in the event the search falls for  as being an improper search, I contend that the statements must also fall because of their direct relationship to the illegal search itself. And for that limited purpose I'm asking these questions.
He pointed out that he was asking "that those statements be suppressed as well." The trial judge sustained the State's objection.
[8] The court there noted:

... This Court is well aware of the fact that police at times do arrest persons on one charge, primarily for the purpose of detaining them while building a case on another charge. We have held that such a technique does not cause the initial arrest, if otherwise legitimate, to become invalid, nor evidence resulting therefrom to be necessarily inadmissible.