STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. JOSEPH P. BRUZZESE, DEFENDANT-RESPONDENT.

Argued March 8, 1983—Decided August 8, 1983.

212

*Frank D. DeVito,* Assistant Prosecutor, argued the cause for appellant (*John H. Stamler,* Union County Prosecutor, attorney).

*Anthony D. Rinaldo, Jr.,* argued the cause for respondent (*Rinaldo and Rinaldo,* attorneys).

*Mary L. Cupo,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of the State of New Jersey (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

This case focuses upon the constitutionality of the seizure of evidence from an individual's home incident to the execution at his home of an outstanding arrest warrant on an unrelated charge. Specifically, the issue here is whether incriminating boots seized by police from defendant's bedroom in the course of arresting him on an unrelated contempt of court charge were admissible to prove defendant's involvement in a burglary. Subsumed within this issue is the fundamental question of whether the court should consider the subjective motives and intent of a law enforcement officer in determining the reasonableness of a search and seizure under the Fourth Amendment and under Article I, paragraph 7 of the New Jersey Constitution.

On an autumn evening in 1980, a burglary occurred at Madan Plastics, Inc. (Madan), in Cranford, New Jersey. In the course of investigating the burglary, the Cranford police discovered a distinctive sole imprint on the panel of a rear door of Madan that had been kicked in during the burglary. The sole imprint bore a unique diamond design in the center, with narrow holes around the perimeter of the heel. Although it appeared that the imprint was that of a boot, it was impossible from this evidence to determine the boot's size or shape.

During the course of the Cranford Police Department's investigation, defendant's name surfaced as a suspect. The police

learned that defendant was a former employee at Madan and that on the night of the burglary defendant had told friends "he was going to get even with the people at Madan Plastics for firing him." The police also learned that defendant had walked home that night and that he lived about a quarter of a mile from Madan. They were also advised that defendant had been wearing black work boots on that occasion.

On November 13, 1980, the investigation of the Madan burglary was turned over to Detective John Hicks of the Cranford Police Department. After learning that defendant was a suspect, Hicks ran a routine check to determine whether defendant had a criminal record. The check disclosed that there was an outstanding arrest warrant issued against defendant by the Cranford Municipal Court, for contempt of court. The contempt citation evidently had arisen from defendant's failure to appear in court on an unrelated matter.[1]

Detective Hicks decided to go to defendant's home to execute the arrest warrant. He testified candidly that he elected to do this for two reasons: "one, that we had a warrant for his arrest, and the other was I wanted to speak to him about the burglary due to the fact that he was a suspect." Since the defendant lived with his mother and aunt in the neighboring town of Roselle Park, Hicks solicited the cooperation of the Roselle Park police in arresting defendant at his home.

Thereafter at approximately 10:30 a.m. on November 14, 1980, Hicks, along with another Cranford policeman named Mayer and two officers from the Roselle Park Police Department, went to defendant's home. Hicks testified that all four officers went to defendant's home because defendant reportedly had a tendency to become violent with the police.[2] Two of the officers went to

[1] The record does not disclose the nature of the matter that required defendant's court appearance.

[2] The trial court discounted this testimony because the State failed to offer any foundation to support this assertion.

the back door while Hicks, dressed in plain clothes, and Mayer rang the front doorbell.

Defendant's aunt opened the door. When the police told her they wanted to speak to her nephew, she allowed them to enter the house. She then went upstairs to get the defendant, where he apparently was sleeping. The police remained downstairs.

Shortly thereafter, defendant came downstairs without shoes and clad in a tee-shirt and pants. Hicks and Mayer immediately identified themselves as police officers and informed defendant that they were there to pick him up on the outstanding arrest warrant. They then placed defendant under arrest, and advised him that he was going to be taken to the Cranford police station. The police also informed defendant that bail had been posted at $50.00. Hicks did not advise the defendant at this point of his desire to discuss the Madan burglary.

Defendant told the officers that he wanted to put on shoes and a jacket before going outside. Without invitation, Hicks and Mayer followed defendant upstairs to his bedroom. There is some testimony that defendant had requested the police to wait downstairs, but that Hicks had replied that they had to accompany defendant.

Once in the bedroom, defendant changed his shirt and put on a pair of shoes. He then walked over to his dresser to secure money to post bail. While defendant stood at the dresser, Hicks noticed a pair of black boots standing upright under the dresser. Hicks picked up the boots and examined their soles. The soles corresponded to the impression that Hicks had seen on the rear door panel at Madan. Hicks seized the boots and told defendant that he was taking them to police headquarters for further examination. Hicks advised defendant that he would explain his interest in the boots when they got to headquarters.

Defendant was subsequently indicted in Union County for burglary, theft, and criminal mischief. Counsel for defendant then moved to suppress the boots as evidence. The trial court granted defendant's motion, finding the seizure of the boots the

product of a pretextual search violative of defendant's constitutional rights. The Appellate Division, in an opinion by Judge Gaulkin, affirmed the trial court's decision to suppress the evidence. 187 *N.J.Super.* 435 (1982). Judge Joelson, who joined in the result, filed a separate concurring opinion and Judge Milmed dissented. We granted leave to the Union County Prosecutor to appeal from the interlocutory suppression order under *R.* 2:2–2(b). 91 *N.J.* 577 (1982).

We reverse the Appellate Division and hold that Hicks's presence in defendant's bedroom and his seizure of defendant's boots was reasonable under the Fourth Amendment of the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution. Accordingly, the boots are admissible into evidence.

## I.

Both the Fourth Amendment of the Constitution of the United States and Article I, paragraph 7 of the New Jersey Constitution protect "[t]he right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures . . . ." *U.S. Const.* amend. IV; *N.J. Const.* art. 1, ¶ 7 (emphasis added). The language of the Fourth Amendment of the federal constitution and of Article I, paragraph 7 of our state constitution is virtually identical. We recognize that this Court has the power to afford citizens of this State greater protection against unreasonable searches and seizures than may be required by the Supreme Court's prevailing interpretation of the Fourth Amendment. *State v. Hunt,* 91 *N.J.* 338, 344–46 (1982); *State v. Alston,* 88 *N.J.* 211, 225 (1981); *State v. Johnson,* 68 *N.J.* 349, 353 (1975). We find, however, that the search was lawful under Article I, paragraph 7 of the New Jersey Constitution as well as under the Fourth Amendment. Accordingly, our holding with respect to the validity of instant search and seizure under the Fourth Amendment of the

United States Constitution is equally applicable under Article I, paragraph 7 of the New Jersey Constitution.[3]

The Supreme Court has consistently asserted that "the rights of privacy and personal security protected by the Fourth Amendment . . . are to be regarded as of the very essence of constitutional liberty . . . ." *Harris v. United States,* 331 *U.S.* 145, 150, 67 *S.Ct.* 1098, 1101, 91 *L.Ed.* 1399, 1405 (1947) (quoting *Gouled v. United States,* 255 *U.S.* 298, 304, 41 *S.Ct.* 261, 263, 65 *L.Ed.* 647, 650 (1921)). Historically, the Court has applied a more stringent standard of the Fourth Amendment to searches of a residential dwelling. *E.g., Steagald v. United States,* 451 *U.S.* 204, 101 *S.Ct.* 1642, 68 *L.Ed.2d* 38 (1981); *Payton v. New York,* 445 *U.S.* 573, 100 *S.Ct.* 1371, 63 *L.Ed.2d* 639 (1980); *Chimel v. California,* 395 *U.S.* 752, 89 *S.Ct.* 2034, 23 *L.Ed.2d* 685 (1969). Indeed, one of this country's most protected rights throughout history has been the sanctity and privacy of a person's home. *See generally* N. Lasson, *The History and Development of the Fourth Amendment to the United States Constitution* (1937).

Nevertheless, the Fourth Amendment does not proscribe all searches and seizures, but only those that are judicially deemed unreasonable. *State v. Campbell,* 53 *N.J.* 230, 233 (1969). Indeed, the touchstone of the Fourth Amendment is reasonableness. *See Delaware v. Prouse,* 440 *U.S.* 648, 653–55, 99 *S.Ct.* 1391, 1395–97, 59 *L.Ed.2d* 660, 667–68 (1979); *Cady v. Dombrowski,* 413 *U.S.* 433, 439, 93 *S.Ct.* 2523, 2527, 37 *L.Ed.2d* 706, 713 (1973); *Camara v. Municipal Court,* 387 *U.S.* 523, 539, 87 *S.Ct.* 1727, 1736, 18 *L.Ed.2d* 930, 941 (1967); *see also State v. Slockbower,* 79 *N.J.* 1, 21–24 (1979) (Schreiber, J. dissenting);

---

[3]Consonant with the United States Supreme Court's directive in *Michigan v. Long,* —— *U.S.* ——, —— – ——, 103 *S.Ct.* 3469, 3474–78, 77 *L.Ed.2d* —— (1983), we expressly observe that our decision today rests, in part, upon state constitutional grounds independent of federal law. The federal cases that we cite in support of our interpretation of the New Jersey Constitution "are being used only for the purpose of guidance, and do not themselves compel the result that [this Court] has reached." *Id.* at ——, 103 *S.Ct.* at 3476.

*State v. Davis,* 50 *N.J.* 16, 22 (1967), *cert. den.,* 389 *U.S.* 1054, 88 *S.Ct.* 805, 19 *L.Ed.*2d 852 (1968). This constitutional test of reasonableness is satisfied where the police obtain, upon a showing of probable cause, a search warrant from a neutral magistrate. *See United States v. United States District Court,* 407 *U.S.* 297, 314–21, 92 *S.Ct.* 2125, 2135–39, 32 *L.Ed.*2d 752, 765–69 (1972); *see also State v. Valencia,* 93 *N.J.* 126 (1983) (holding telephonic search warrant as reasonable in certain circumstances). The cautionary procedure of procuring a warrant ensures that there is a reasonable basis for the search and that the police intrusion will be reasonably confined in scope. *Katz v. United States,* 389 *U.S.* 347, 358–59, 88 *S.Ct.* 507, 515, 19 *L.Ed.*2d 576, 585–86 (1967).

"In contrast, a warrantless search is presumed to be invalid. Hence, the State must prove the overall reasonableness and validity of [such a] search." *State v. Valencia, supra,* 93 *N.J.* at 133. Over the years, the United States Supreme Court has developed a number of circumscribed exceptions to the warrant requirement. *E.g., New York v. Belton,* 453 *U.S.* 454, 101 *S.Ct.* 2860, 69 *L.Ed.*2d 768 (1981) (automobile search incident to arrest of occupant); *Chimel v. California, supra* (limited area search incident to custodial arrest); *Terry v. Ohio,* 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L.Ed.*2d 889 (1968) (investigatory "stop and frisk"); *Warden v. Hayden,* 387 *U.S.* 294, 87 *S.Ct.* 1642, 1647, 18 *L.Ed.*2d 782 (1967) (search of premises in "hot pursuit" of fugitive); *Carroll v. United States,* 267 *U.S.* 132, 45 *S.Ct.* 280, 69 *L.Ed.*2d 543 (1925) (vehicle search in circumstances where impracticable to secure a warrant). These recognized exceptions are justified on the grounds of reasonableness. *See, e.g., Chimel,* 395 *U.S.* at 762–65, 89 *S.Ct.* at 2039–41, 23 *L.Ed.*2d at 694–95; *Terry,* 392 *U.S.* at 30–31, 88 *S.Ct.* at 1884, 20 *L.Ed.*2d at 911. A warrantless search that does not fall within one of the enumerated exceptions is presumptively unconstitutional. *State v. Alston,* 88 *N.J.* 211, 230 (1981); *State v. Young,* 87 *N.J.* 132, 141 (1981); *State v. Patino,* 83 *N.J.* 1, 7 (1980).

In the case at bar, it is generally agreed that Detective Hick's actions were, on the whole, reasonable and in accordance with the recognized exceptions and objective restrictions set forth by the Supreme Court governing warrantless searches. Defendant alleges, however, that although the search and seizure was objectively reasonable, it was unconstitutional because the execution of the arrest warrant served as a mere pretext for the search of the defendant's home. This contention was accepted by both of the courts below as the basis for requiring the exclusion of the boots. As the Appellate Division stated, "[W]e determine that the observation and seizure of the boots, although ostensibly valid, were in fact pretextual and arbitrary, and accordingly, were in violation of the Fourth Amendment and the parallel provision of our New Jersey Constitution." 187 N.J.Super. at 446.

Stated in its barest form, the implication of the decisions of the trial judge and the Appellate Division in this case is that courts must consider police officers' subjective motives in determining whether a search is valid under the Fourth Amendment and Article I, paragraph 7 of the New Jersey Constitution. The State contends that the subjective intent of the police officer is of no significance in evaluating his alleged violation of the Fourth Amendment so long as his acts are reasonable. In particular, the State argues that the courts below improperly considered the subjective motives of Officer Hicks in executing the arrest warrant at defendant's home. We agree.

█ We hold that the proper inquiry for determining the constitutionality of a search-and-seizure is whether the conduct of the law enforcement officer who undertook the search was objectively reasonable, without regard to his or her underlying motives or intent. We emphasize that the Fourth Amendment proscribes unreasonable actions, not improper thoughts. In determining whether a police officer's actions are constitutional, we do not rely on the officer's own subjective appraisal, but

upon an objective evaluation by a neutral judicial authority. As Chief Justice Warren stated in *Terry:*

> The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate? [392 U.S. at 21–22, 88 *S.Ct.* at 1879, 20 *L.Ed.* at 906 (footnotes omitted)]

This position was reaffirmed by the Supreme Court in *Scott v. United States,* 436 *U.S.* 128, 98 *S.Ct.* 1717, 56 *L.Ed.*2d 168 (1978), in which the Court reviewed the constitutionality of wholesale wiretapping of telephone conversations by government agents. The *Scott* majority rejected the notion that the validity of the wiretaps hinged upon the agents' lack of subjective desire to minimize the number of intercepted conversations. Rather, the Court ruled that the Fourth Amendment required "an objective assessment of an officer's actions in light of the facts and circumstances known to him." *Scott,* 436 *U.S.* at 137, 98 *S.Ct.* at 1723, 56 *L.Ed.*2d at 177. This assessment is accomplished without regard to the underlying intent or motivation of the officers involved. "[T]he fact that the [searching] officer does not have the state of mind hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, *viewed objectively,* justify that action." *Id.* at 138, 98 *S.Ct.* at 1723, 56 *L.Ed.*2d at 178. (emphasis added). *Accord Delaware v. Prouse, supra,* 440 *U.S.* at 654, 99 *S.Ct.* at 1396, 59 *L.Ed.*2d at 668 ("the reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against 'an objective standard' ").

The *Scott* "objective approach" was again endorsed by the Supreme Court very recently in *United States v. Villamonte-Marquez,* —— *U.S.* ——, 103 *S.Ct.* 2573, 77 *L.Ed.*2d 22 (1983). There, the Court upheld the boarding of a vessel in American waters by customs officers "under the overarching principle of

'reasonableness' embodied in the Fourth Amendment." *Id.* at ——, 103 *S.Ct.* at 2579. Citing *Scott,* the Court expressly rejected defendant's arguments that the officers were precluded, because of alleged suspicions of hidden contraband, from relying on a statute authorizing their boarding to inspect the vessel's documents. *Id.* at —— n. 3, 103 *S.Ct.* at 2577 n. 3. *Villamonte-Marquez* therefore clearly establishes that the pretext approach advocated by the dissent here is not the prevailing approach of our nation's highest court.

We stress that this objective standard is to be applied only to the facts known to the law enforcement officer at the time of the search. Facts learned by the authorities after the search and seizure occurs will not validate unreasonable intrusions. It is beyond dispute, for example, that "[a] search prosecuted in violation of the Constitution is not made lawful by what it brings to light." *Byars v. United States,* 273 *U.S.* 28, 29, 47 *S.Ct.* 248, 249, 71 *L.Ed.* 520, 522 (1927); *accord State v. Doyle,* 42 *N.J.* 334, 342 (1964). Nor will information discovered in the station house files after the search excuse the ignorance of the searching officers. Here, for example, if the police had arrested defendant at his residence without knowledge of his outstanding warrant, their subsequent discovery of that warrant would not make the incidental search valid *post facto.*

Were the Court to adopt the defendant's subjective rule, practically every search-and-seizure case would require the court to engage in a costly and time-consuming expedition into the state of mind of the searching officer. Since motives are seldom apparent or vocalized, there is little reliable evidence of them. Even where motives are evident, the analysis may still pose problems. Complex creatures that they are, humans usually have several motives. A judge cannot and should not be required to weigh the motives to determine which one guided the officer's behavior. For example, in the case at bar Officer Hicks concededly had two proper motives—to arrest the defendant and

to talk to him about the burglary.[4]  The possibility of uncovering evidence on defendant's premises related to the burglary was only in the "back of his mind."  Years of litigation and cross-examination probably would still not resolve which of these motives was truly dominant.  In sum, "sending state and federal courts on an expedition into the minds of police officers would produce a grave and fruitless misallocation of judicial resources."  *Massachusetts v. Painten,* 389 *U.S.* 560, 565, 88 *S.Ct.* 660, 662, 19 *L.Ed.2d* 770, 773 (1968) (White, J. dissenting).

A further weakness of the subjective approach is that it is neither reliable nor predictable.  Appellate courts with views of human psychology different from those of the trial court would no doubt be tempted to second-guess the latter's assessment of the searching policeman's "true" intentions.  In addition, the precedential significance of every search challenged on "bad faith" grounds would be ambiguous.  The litigated cases would serve less as guidelines for proper police conduct than as proscriptions on certain police thoughts.  Because each individual police officer's thoughts are unique and arise in countless forms and combinations, every bad faith challenge would present an unresolved case of first impression.  In short, the law would become as unfathomable as the policeman's motives themselves.

Thus, we conclude that there is no useful or practical reason to adopt the subjective test.  We believe that it places an unfair burden on law enforcement authorities.  Delving into the so-called ulterior motives of policemen penalizes officers who outwardly behave in a constitutionally appropriate way.  Under this rule, a defendant subjected to an objectively reasonable search may receive a windfall because the searching police officer harbored bad thoughts, despite the fact that those thoughts did not alter the external effects of the officer's actions.  We believe this is a poor way to distinguish which

---

[4]Officer Hicks testified at least six separate times that he executed the arrest warrant at defendant's residence in order to ensure that defendant would appear for questioning at the station house.

defendants subject to identical intrusions on their privacy shall receive the constitutional benefit of the exclusionary rule.[5]

In upholding the trial court's suppression order, the Appellate Division relied in part on this Court's companion decisions in *State v. Slockbower,* 79 *N.J.* 1 (1979), and *State v. Ercolano,* 79 *N.J.* 25 (1979). In both *Slockbower* and *Ercolano* the police impounded and searched the automobile of an individual contemporaneously placed under arrest. In each case, a majority of this Court ruled that the police seizure of evidence from the vehicle was unconstitutional. We would be less than frank to deny that *Slockbower* and *Ercolano* generated substantial disagreement among the members of this Court respecting the proper mode of analysis—as evidenced by the seven separate opinions collectively written in the two cases. Nonetheless, we believe that a common ground is inferable from *Slockbower* and *Ercolano* that is consistent with the constitutional approach we utilize in the instant case.

On their facts, *Slockbower* and *Ercolano* were variations on the same theme. In *Slockbower,* a man driving his wife's car was pulled over and arrested on an outstanding warrant for a traffic violation. The police searched the vehicle on the scene and discovered a firearm and ammunition. They then towed the vehicle to the police station where they conducted a second search, labelling it a routine "inventory." 79 *N.J.* at 5. In *Ercolano,* the police, after arresting defendant on gambling charges, impounded his automobile from where he had safely parked it on a residential street. 79 *N.J.* at 31. A full search of

---

[5]We note in passing that the United States Supreme Court again recently refused to depart from the long-standing principle that a searching officer's state of mind has no bearing upon the applicability of the exclusionary rule to the search. *Illinois v. Gates,* —— *U.S.* ——, 103 *S.Ct.* 2317, 76 *L.Ed.2d* 527 (1983). Even Justice White, who advocated a good-faith exception in his concurring opinion in *Gates,* acknowledged that the applicability of such an exception would still hinge upon a measurement of "the reasonableness of a particular search and seizure . . . *by objective standards." Id.* at ——, 103 *S.Ct.* at 2347 (White, J. concurring) (emphasis added).

the car's interior at police headquarters turned up incriminatory betting slips. *Id.* at 32. The prosecution contended in both cases that the impoundments and interior searches were appropriate safekeeping measures authorized by the United States Supreme Court's decision in *South Dakota v. Opperman,* 428 *U.S.* 364, 96 *S.Ct.* 3092, 49 *L.Ed.*2d 1000 (1976). Not a single member of this Court found those contentions persuasive. Indeed, a majority of this Court regarded the impoundment searches in both cases as objectively unnecessary, since each defendant could have readily made arrangements for the caretaking of his automobile during his period of custody. *See Slockbower,* 79 *N.J.* at 12; *Ercolano, id.* at 46.

In neither *Slockbower* nor *Ercolano* was the impoundment and exploration of the defendant's automobile by the police objectively reasonable. Significantly, the opinion of the Court in both cases expressly recognized that the litmus test for determining the constitutionality of searches and seizures is objective reasonableness:

> In [enumerated] circumstances the decision to "impound" the car was *unreasonable* because unnecessary. [*Slockbower,* 79 *N.J.* at 11 (majority opinion of Conford, P.J.A.D. t/a) (emphasis added)]
>
> \* \* \* \* \* \* \* \*
>
> [T]he validity *vel non* of the search must depend on whether there was a valid impoundment in relation to which the search constituted a *reasonable* inventorying of the contents of the vehicle. [*Ercolano,* 79 *N.J.* at 33 (plurality opinion of Conford, P.J.A.D. t/a) (emphasis added)
>
> \* \* \* \* \* \* \* \*

Hence, the fundamental teaching of *Slockbower* and *Ercolano* is that unreasonable automobile impoundments are unconstitutional. *See State v. Mangold,* 82 *N.J.* 575, 582 (1980).

To be sure, some of our lower courts have mistakenly relied upon the phraseology of "substantial necessity" articulated specifically by Judge Conford and Justice Pashman in *Slockbower* and *Ercolano* as embodying a more stringent test of constitutionality applicable to all Fourth Amendment searches. *See, e.g., State v. Seiss,* 168 *N.J.Super.* 269, 274 (App.Div.1979). We

do not, however, distinguish the "substantial necessity" test from the "reasonableness" test. If the police have no realistic need to impound a defendant's car, *a fortiori,* that impoundment is unreasonable.[6] Further, we did not and do not intend the substantial necessity standard formulated for auto impoundment cases to be exported to other types of searches. Rather, we regard the "substantial necessity" test as merely a shorthand method for determining whether *an automobile impoundment* is objectively reasonable. Other kinds of searches may involve different rules-of-thumb.

We acknowledge that some of the opinions in *Slockbower* and *Ercolano* devoted considerable attention to improper police motives as an additional reason for invalidating their conduct in both cases. In *Slockbower,* the majority described the police impoundment of Slockbower's vehicle after they had already searched it as a "pretextual" attempt to disguise their prior illegal intrusion. 79 *N.J.* at 13. In *Ercolano,* the plurality found that the officers' subjective intent to impound the vehicle only for community safekeeping reasons barred the imposition of a court-devised justification on alternative theories of probable cause or exigent circumstances. 79 *N.J.* at 39–40. We believe that the same results in *Slockbower* and *Ercolano* would obtain under the standard that we embrace today, *i.e.* an objective assessment of the facts then known to the searching police officers.

We also believe that the application of the objective standard will protect the privacy of our citizens and prevent the police from exercising merely pretextual searches. For example, if the police endeavored to "cover up" an objectively unreasonable

---

[6]The precursor of the "substantial necessity" standard for vehicle impoundments we announced in *Slockbower* was originally described as "a showing of *reasonable* necessity" in *State v. McDaniel,* 156 *N.J.Super.* 347, 358 (App.Div. 1978) (emphasis added). In this context, we see no analytic difference between the adjectives "substantial" and "reasonable"—either one embodies an *objective* assessment of the circumstances of the impoundment.

search after the fact with seemingly routine procedures, as in *Slockbower,* we will continue to deem it unconstitutional, not on the grounds that it was performed in "bad faith" but simply because it was an objectively unreasonable search. Similarly, if the police are unaware of facts sufficient to validate a search, the search would be held unconstitutional, not because of the policeman's subjective motives but because, viewed objectively, he did not have sufficient facts to make a reasonable search.

We do not share the dissent's fears that the objective test will be applied by our lower courts as "an instrument of injustice." *Post* at 247. We are confident that many, if not all, of the egregious intrusions condemned by our dissenting colleague and other supporters of the subjective approach will also be invalidated under the objective standard. The requirement of reasonableness is not one without teeth. *See, e.g., United States v. Place,* —— *U.S.* ——, ——, 103 *S.Ct.* 2637, 2646, 77 *L.Ed.*2d 110 (1983) (invalidating 90-minute detention of airline traveler's luggage for investigatory purposes as "unreasonable under the Fourth Amendment").

In discarding the general use of a subjectivity analysis, we do not condone searches that are not undertaken to further valid law enforcement aims. For example, we afford no legal protection to police officers who invade the privacy of citizens as a means of racist or political harassment. Such searches would be unconstitutional, not because of the police officer's subjective motives, but because, viewed objectively, the searches do not reasonably advance the legitimate goals of law enforcement. We stress that we do not abandon today the requirement that a police officer's conduct conform to that of "a reasonably prudent man in the circumstances." *Terry,* 392 *U.S.* at 27, 88 *S.Ct.* at 1883, 20 *L.Ed.*2d at 909.

Earlier this Term in *State v. Guerra,* 93 *N.J.* 146 (1983), we similarly endorsed the objective standard in evaluating the propriety of a warrantless automobile search. In *Guerra,* the police searched a car trunk for marijuana after obtaining over

the telephone judicial consent for the search. We sustained the search as reasonable under the recognized "automobile exception" to the Fourth Amendment warrant requirement, despite the fact that the telephone authorization itself was defective. Writing for the Court, Justice Handler observed,

> It has been recognized in various contexts that if the validity of a search can be sustained independently on *objective grounds demonstrating reasonableness,* the existence of other defects that do not derogate from the *overall objective reasonableness of the search* or impugn the integrity of the judicial process should not be relied upon to invalidate the search. [*State v. Guerra,* 93 *N.J.* at 152 (emphasis added) ]

Those sound principles equally guide our rejection of the "bad faith doctrine" here.

Having established the governing standard of objective reasonableness, we now apply that standard to the facts of this case. We shall apply that standard sequentially to each step of the police's actions here: first, the execution of the arrest warrant at defendant's residence; second, the accompaniment of defendant to his upstairs bedroom; and third, the inspection and seizure of defendant's boots.

## II.

The execution of the arrest warrant at the defendant's home was a reasonable police action. Given what Detective Hicks knew about the burglary and defendant, he was justified in executing the arrest warrant in person. Hicks had information that made the defendant a prime suspect in a burglary. He was aware that there was an active warrant outstanding for defendant's arrest. The arrest warrant, which defendant concedes was valid, was not issued at the instigation of Hicks, but issued by the Cranford Municipal Court prior to the burglary. The Appellate Division found that Hicks's search was arbitrary because he supposedly deviated from the more routine procedure of telephoning the individual charged with contempt and requesting him to come down to police headquarters. 187 *N.J.Super.* at 445–46. Our review of the facts, however, discloses that Hicks's

execution of the warrant in person did not represent a significant departure from the norms of proper police behavior.

In any event, there is no need to determine whether Hicks's conduct constituted a "deviation," since that determination is not dispositive of the propriety of the search. We do not endorse the rule that a search shall be deemed unreasonable merely because a police officer deviates from his department's standard operating procedure. This theory is espoused by Professor LaFave, in his *Search and Seizure* treatise, and cited as support in Judge Gaulkin's Appellate Division opinion. See 1 *LaFave, Search and Seizure* (Cum.Supp.), § 1.2 at 16–18 (1978) *cited in State v. Bruzzese,* 187 *N.J.Super.* at 445–46. The adoption of such a rule would discourage police officers from thinking and from exercising initiative. There are numerous situations that arise in law enforcement that are unique and call for a special response. It is impossible for a police department to envision and to develop standard operating procedures for all such situations. In many police departments, the standard procedures are more the result of budget constraints than what the departments believe to be ideal operating procedures. To hold that a policeman's conduct is unreasonable because it deviates from standard procedure would penalize the best officers and discourage imaginative police investigative work. For these reasons, we do not hold that a search should be deemed unreasonable *per se* if the police officer deviates from standard operating procedure, but rather adopt the rule that a deviation from standard police practice should be examined on its merits to determine whether it constitutes an unreasonable act.

Here, we hold that Hicks's execution of the arrest warrant in person was reasonable. It is undisputed that under *N.J.S.A.* 2A:10–8 a police officer has the power to serve a contempt warrant and "to produce the person subject to punishment for contempt ... before the judge of such court issuing said warrant." Upon issuance of a lawful arrest warrant, a police officer has the right to execute the warrant by arresting a

defendant at his or her home.[7] There is no legal requirement that before executing a valid arrest warrant a police officer must telephone the person sought and request that he voluntarily appear at headquarters. In this case, it is conceivable that a policeman's telephone call informing defendant of an outstanding warrant for his arrest would have alerted him that the authorities suspected him in the burglary and might well have resulted in defendant fleeing the jurisdiction.

The circumstances of the defendant's arrest disclose that the officers exercised a legitimate investigatory technique in a proper and reasonable manner. The hour of the arrest, 10:30 a.m., was reasonable. The police did not time the arrest for an early hour to increase the likelihood that defendant would be asleep or not dressed, thereby enhancing their opportunity to go to defendant's bedroom. Their entry into the house was entirely proper. They were polite, nonviolent, and entered only upon the consent of defendant's aunt. While defendant's aunt went upstairs to get him, the police officers remained downstairs. They did not explore any room of the house. When defendant came downstairs, Hicks promptly identified himself and placed defendant under arrest.

Given these facts, we cannot subscribe to the dissent's conclusion that "the arrest warrant was sought, served, and used as a means of gaining access to the defendant's home and personal belongings." *Post* at 252. The purpose of the police's visit was not, as the dissent contends, to search defendant's personal effects. Rather, the officers came to his home in order to execute a concededly-valid arrest warrant. This conclusion was shared by the trial judge himself at the suppression hearing:

> The officers went there, it's apparent for the purpose of arresting the defendant; not with respect to Madan Plastics, but with respect to the contempt charge.

The reasoning of the dissent suggests that the arrest warrant was improperly used here in order to bypass the procedural

---

[7]*R.* 3:3–3(b) states that an arrest warrant "may be executed and the summons served *at any place* within the State." (emphasis added).

obstacles involved in obtaining a search warrant for defendant's home. This view, we surmise, is premised upon the notion that the police had probable cause to believe burglary evidence was located in defendant's residence, and due to perhaps either haste or laziness, failed to appear before a magistrate and secure a warrant before undertaking their "planned search." We disagree with this interpretation for two reasons. First, it is by no means clear that the police had probable cause beforehand to search defendant's house. The trial judge himself regarded that to be "a debatable question." Second, if the police indeed intended to conduct an exploratory search of Bruzzese's home, they surely would have done more than glance around defendant's room—a room in which their presence was largely fortuitous. Thus, even under the dissent's own subjective analysis, the record does not reveal a bad faith effort to conduct a full-blown warrantless search.

We conclude that the arrest of defendant at his home was reasonable and that the officers' conduct in effecting the arrest was likewise reasonable.

### III.

Defendant alleges that even if the execution of the arrest warrant was reasonable, the officers had no right to accompany him to his bedroom. We disagree. We hold that Detective Hicks had the right to remain literally at defendant's elbow at all times and that such action was reasonable under the Fourth Amendment of the United States Constitution.

Last Term, the United States Supreme Court decided this very question in *Washington v. Chrisman*, 455 *U.S.* 1, 102 *S.Ct.* 812, 70 *L.Ed.*2d 778 (1982). In *Chrisman*, a university policeman stopped a student who was carrying a bottle of gin and who appeared to be under the minimum drinking age. The officer asked the student for his identification. Having none on hand, the student requested the opportunity to .get his identification from his dormitory room. The officer accompanied him there

and, while standing in the doorway, noticed what he believed to be marijuana seeds. The officer entered the room, confirmed that the seeds were marijuana, and placed the student under lawful arrest. The student moved to suppress the evidence on the ground that the officer had no right to enter the room, absent a showing of exigent circumstances, and to seize the contraband without a warrant. In rejecting the student's claim, the Court stated:

> We hold, therefore, that it is not "unreasonable" under the Fourth Amendment for a police officer, as a matter of routine, *to monitor the movements of an arrested person, as his judgment dictates, following the arrest.* The officer's need to ensure his own safety—as well as the integrity of the arrest—is compelling. Such surveillance is not an impermissible invasion of the privacy or personal liberty of an individual who has been arrested. [*Washington v. Chrisman,* 102 *S.Ct.* at 817, 70 *L.Ed.*2d at 785 (emphasis added) (footnote omitted)]

One of the primary reasons for the Supreme Court's decision in *Chrisman* was to protect the police, as Chief Justice Burger observed:

> Every arrest must be presumed to present a risk of danger to the arresting officer. Cf. *United States v. Robinson,* supra, at 234 n. 5, 38 *L.Ed.*2d 427, 94 *S.Ct.* 467 [at 476 n. 5], 66 *Ohio Ops* 2d 202. There is no way for an officer to predict reliably how a particular subject will react to arrest or the degree of the potential danger. Moreover, the possibility that an arrested person will attempt to escape if not property supervised is obvious. Although the Supreme Court of Washington found little likelihood that [the arrested student] could escape from his dormitory room, an arresting officer's custodial authority over an arrested person does not depend upon a reviewing court's after-the-fact assessment of the particular arrest situation. Cf. *New York v. Belton,* 453 *U.S.* 454, 458–460, 69 *L.Ed.*2d 768, 101 *S.Ct.* 2860 [2863–64] (1981); *United States v. Robinson,* supra, at 235, 38 *L.Ed.*2d 427, 94 *S.Ct.* 467 [at 477], 66 *Ohio Ops* 2d 202. [*Chrisman,* 102 *S.Ct.* at 817, 70 *L.Ed.*2d at 785]

Other jurisdictions have utilized a *Chrisman* approach. *See, e.g., Contreras v. United States,* 672 *F.*2d 307 (2d Cir.1982) ("security search" of apartment before allowing arrestee to go in and get dressed, held proper); *United States v. Mason,* 523 *F.* 2d 1122, 1126 (D.C.Cir.1975) (FBI agents permissibly escorted arrestee around his apartment to go to the bathroom and to put on shoes); *Hartline v. State,* 161 *Ga.App.* 847, 849, 288 *S.E.*2d 902, 904 (1982) (police followed arrestee into his house to obtain

his driver's license for identification); *State v. Roberts,* 31 *Wash.App.* 375, 642 *P.2d* 762 (1982) (police accompanied arrestee into apartment to retrieve personal belongings). *See also Moffett v. State,* 291 *Ala.* 382, 281 *So.2d* 630 (1973), *cert.* den., 414 *U.S.* 1161, 94 *S.Ct.* 924, 39 *L.Ed.2d* 114 (1974); *People v. Green,* 14 *Ill.*App.3d 972, 981, 304 *N.E.2d* 32, 40 (1973); *Clark v. State,* 548 *S.W.2d* 888 (Tex.Cr.App.1977). We find these parallel authorities instructive.

■ Since the *Chrisman* decision, this Court has not specifically addressed the issue of whether a police officer has the right to monitor the movements of an arrested person following the individual's arrest. We do so now. Our review of *Chrisman* and the cases cited above convinces us that the reasons advanced by the Supreme Court for its holding are equally applicable in New Jersey. Accordingly, we rule that once a defendant is placed under lawful arrest, the arresting officer has the right to remain at his side and to follow him wherever he chooses to go. The officer need not posit any special need for the accompaniment so long as the arrest is lawful. The accompaniment is purely a precautionary measure.

In adopting this rule, we balance, as we must in all search and seizure cases, the interests of public safety, in this instance the protection of policemen, against the intrusion upon the privacy of and inconvenience to an individual. *Delaware v. Prouse, supra,* 440 *U.S.* at 654, 99 *S.Ct.* at 1396, 59 *L.Ed.2d* at 667; *Terry v. Ohio, supra,* 392 *U.S.* at 21–27, 88 *S.Ct.* at 1879–83, 20 *L.Ed.2d* at 905–09. While we realize that the privacy rights of an individual who is placed under lawful arrest are diminished, we nonetheless conclude that the arresting police officer is entitled to the protection he or she would receive under this rule. We base this conclusion in part upon a recognition of the pervasiveness of dangerous criminal activity in our State today.

This Court has previously recognized the need to consider the criminal environment to determine the constitutionality of a police action. For example, in *State v. Interest of H.B.,* 75 *N.J.*

243 (1977), Chief Justice Hughes, in upholding a policeman's protective frisk of a suspect for weapons, wrote:

> Th[e] volatile mixture, of violence and the surfeit of handguns which is its primary co-efficient, presents much danger to law-abiding society and a particular threat to the uniformed law enforcement community which is so frequently its target. This astounding situation is a factor which cannot be ignored in considering the constitutionality of the police conduct here involved.
>
>    *     *     *     *     *     *     *     *
>
> New Jersey, highly congested and with its share of crime and its causes, is no stranger to this national malady. Twenty-four police officers were killed by guns in this State during the ten year period ending in 1976. During 1976, there were a record five New Jersey police officers killed and 3,903 assaulted in the line of duty. Of every 100 municipal police officers, 21.5 were assaulted during 1976. New Jersey State Police, *Uniform Crime Reports for the State of New Jersey*—1976, at iv. [*State In the Interest of H.B.*, 75 *N.J.* at 246]

Things have not improved since 1976. Since that time, the number of violent acts committed upon police officers has appreciably increased. A comparison of the 1976 statistics cited by Chief Justice Hughes with those reported in 1981 indicates that police work got more, not less, dangerous over the five-year period. In 1981, 4,850 policemen were assaulted in the line of duty—a 24% increase over the 1976 total of 3,903. New Jersey State Police, *Uniform Crime Report for the State of New Jersey for 1981* 181 (1982). Meanwhile, the ratio of municipal police officers assaulted per 100 rose from 21.5 in 1976 to 25.5 in 1981. *Id.* At least 336 of these assaults involved the use of a weapon against the patrolman. *Id.* at 182. Furthermore, 740, or 17%, of the assaults occurred when the police were attempting *to effectuate an arrest. Id.* at 183.

Thus, we know from bitter experience that every arrest, regardless of the nature of the offense, must be presumed to present a risk of danger to an officer. The proliferation of handguns poses a constant danger to law enforcement officers. That danger requires that each patrolman should have the right to monitor the movements of an arrestee to guard against the possibility that he could secure a hidden weapon. We note that this is not the first time this Term we have taken judicial notice of the need to protect persons from the increased use of fire-

arms in this State.  See *State v. Des Marets,* 92 *N.J.* 62, 72 (1983).

There is also present the constant risk that the arrested defendant will seek to escape.  We find it reasonable to permit policemen to keep arrested persons in sight and within reach to prevent their escape.  To rule otherwise would risk the dispersion of once-captured criminals back into the safety of our communities.  We find the *Chrisman* rule offers a sensible middle ground between handcuffing each arrestee or allowing all arrestees the freedom to flee from custody.

We note that except for *State v. Seiss, supra,* 168 *N.J.Super.* 269 (App.Div.1979), our lower courts also have followed the *Chrisman* approach.  *See, e.g., State v. Brown,* 132 *N.J.Super.* 180 (App.Div.1975) (police followed arrestee to hotel room to retrieve jacket; no evidence that he was armed or dangerous); *see also State v. Smith,* 140 *N.J.Super.* 368 (App.Div.1976) (police authorized in entering bedroom where arrestee's housemates were dressing).  On its facts, *Seiss* is distinguishable from this case because the *Seiss* court found that the police invaded defendant's home solely to conduct an exploratory search.  132 *N.J.Super.* at 276.  Here, there was no exhaustive, widesweeping search.  As Officer Hicks testified, the police came to defendant's home not to conduct a search, but to "talk to him regarding the burglary at Madan."  However, to the extent that the legal discussion in *Seiss* denies a police officer the unequivocal right to accompany a person he has lawfully arrested, it is disapproved.

In adopting the *Chrisman* rule as the law of New Jersey, we further note that police monitoring of arrestee movements must be conducted in an objectively reasonable fashion.  For example, police cannot use the rule "to lead the accused from place to place and attempt to use his presence in each location to justify a search."  *Mason, supra,* 523 *F.*2d at 1126.  An officer cannot direct an arrested individual to go to another area without a legitimate reason grounded in the safety of the police or the

public. *Cf. United States v. Roper,* 681 *F.*2d 1354, 1358 (11th Cir.1982) ("exigent circumstances" justified police returning arrestee to his motel room from crowded hallway).

None of these limitations applies here. Nothing in this record suggests that the police arrested defendant at his home to conduct an exploratory search of his room. We emphasize that the police did not create the scenario that prompted defendant to return to his bedroom. *Cf. State v. Welsh,* 167 *N.J.Super.* 233, 236 (App.Div.1979) (invalidating automobile search where situation necessitating search had been "created entirely by the police"), aff'd, 84 *N.J.* 346, 356 (1980). The officers arrived at a reasonable hour at which it was likely that defendant would be dressed. It was the defendant himself who decided to go upstairs. Defendant could have requested his aunt to get his clothes. The police did not search any other room of the house. The police did not order or even suggest that defendant go upstairs to the bedroom or anywhere else in the house. Even after the police told the defendant they would have to accompany him, he could have declined to go upstairs or asked his aunt at that point to get his clothes. If defendant, partially clad, had elected to depart from his house with the police, the officers could not have entered his bedroom without a search warrant.

In sum, the policeman's act of following defendant upstairs was a reasonable consequence of defendant's own voluntary choice to go to his bedroom and get dressed. We conclude that Hicks's action in following the defendant upstairs was reasonable, and hence, constitutional, under both the Fourth Amendment of the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution.

## IV.

Once lawfully in the bedroom, Detective Hicks observed a pair of boots standing upright under the defendant's dresser. The State alleges that the evidence was properly seized under the well-recognized "plain view" exception to a warrantless seizure

of property under the Fourth Amendment. *See Texas v. Brown,* —— *U.S.* ——, 103 *S.Ct.* 1535, 75 *L.Ed.*2d 502 (1983); *Coolidge v. New Hampshire,* 403 *U.S.* 443, 91 *S.Ct.* 2022, 29 *L.Ed.* 2d 564 (1971). The defendant alleges that the plain view exception does not apply here because the search was a planned warrantless search of the kind condemned by the Supreme Court in *Coolidge,* 403 *U.S.* at 469–73, 91 *S.Ct.* at 2040–42, 29 *L.Ed.*2d at 585–87.

The Supreme Court recently reviewed the plain view exception in *Texas v. Brown, supra.* Although the Court unanimously agreed in the judgment, it was unable to agree in a majority opinion.[8] In *Texas v. Brown,* the Supreme Court discussed the three requirements that have to be satisfied under *Coolidge* for the plain view exception to warrantless searches to apply:

First, the police officer must be lawfully in the viewing area. *Coolidge,* 403 *U.S.* at 465–68, 91 *S.Ct.* at 2037–39, 29 *L.Ed.*2d at 582–84;

Second, the officer has to discover the evidence "inadvertently," meaning that he did not know in advance where evidence was located nor intend beforehand to seize it. *Id.;* 403 *U.S.* at 470, 91 *S.Ct.* at 2040, 29 *L.Ed.*2d at 585;

Third, it has to be "immediately apparent" to the police that the items in plain view were evidence of a crime, contraband, or otherwise subject to seizure. *Id.,* 403 *U.S.* at 466; 91 *S.Ct.* at 2038, 29 *L.Ed.*2d at 583.

The Court's plurality opinion in *Texas v. Brown* adopted the first and second requirements of *Coolidge,* but modified the third. The plurality concluded that lower courts had erroneously interpreted "immediately apparent" to require that the searching police officer have an unduly high degree of certainty

---

[8]The Chief Justice and Justices Rehnquist, White and O'Connor joined in one opinion; Justices Powell and Blackman concurred in another opinion; Justices Stevens, Brennan and Marshall concurred in a third opinion; and Justice White wrote a fourth separate concurring opinion.

as to the incriminating character of the evidence. *Texas v. Brown*, —— *U.S.* at ——, 103 *S.Ct.* at 1542, 75 *L.Ed.*2d at 513. This interpretation, in the plurality's view, excessively narrowed the scope of permissible plain view seizures. *Id.* The plurality therefore modified the third requirement to mean that in order to seize evidence in plain view a police officer must have "probable cause to associate the property with criminal activity." *Id.* at ——, 103 *S.Ct.* at 1542, 75 *L.Ed.*2d at 513.[9] Since the officer need not be certain that the seized item is evidence of a crime, it presumably would be easier for the State to prove the *Texas* standard than the "immediately apparent" standard of *Coolidge.* All the officer needs to meet the third requirement is "[a] 'practical, nontechnical' probability that incriminating evidence is involved." *Id.* at ——, 103 *S.Ct.* at 1543, 75 *L.Ed.*2d at 514. In determining whether the officer has probable cause to associate the item with criminal activity, the court looks to what the police officer reasonably knew at the time of the seizure. In *Texas v. Brown,* for example, the Court relied substantially upon the policeman's experienced knowledge of drug-trafficking techniques in upholding his decision to seize tied-off balloons found in defendant's car. *Id.* at ——, 103 *S.Ct.* at 1543, 75 *L.Ed.*2d at 514.

There is merit in adopting these *Texas v. Brown* requirements to establish the plain view exception. We do not believe that a police officer lawfully in the viewing area must close his eyes to suspicious evidence in plain view. The Supreme Court's rule merely requires that "the facts available to the officer would 'warrant a man of reasonable caution in the belief' [citation omitted] that certain items may be contraband, or stolen property or useful as evidence of a crime, it does not demand any showing that such belief be correct or more likely true than false." *Id.* The Supreme Court's three plain view

---

[9]This phraseology originally appeared in the Court's opinion in *Payton v. New York, supra,* 445 *U.S.* at 587, 100 *S.Ct.* at 1380, 63 *L.Ed.*2d at 651.

requirements comport with the overall constitutional standard of reasonableness. Hence, we adopt them as the law of New Jersey.

■ All three requirements for the application of the plain view doctrine are satisfied here. First, as established *supra,* at 230–235, Hicks had a lawful right to be in the defendant's bedroom. The boots were in plain view, were not hidden in a closet, but in the officer's line of vision under the dresser.

Second, Hicks discovered the boots inadvertently. The police came to defendant's home to take him into custody and to question him at headquarters. They did not know in advance that defendant would not be dressed, or that they would have an opportunity to enter his bedroom. They were not certain whether defendant owned the boots, where the boots were located, or their shape, size or color. The "hope" nestled in the back of Detective Hicks's mind that he might learn something about the burglary in the course of defendant's arrest does not defeat the notion that his discovery of the boots was an inadvertent fortuity. *See United States v. Johnson,* 707 *F.2d* 317, 321 (8th Cir.1983) (holding plain view discovery of firearms in defendant's residence "inadvertent," notwithstanding that police expected to find weapons there and may have been able to obtain a warrant to search for them).

The third requirement is also met. Hicks knew that defendant was a prime suspect in a burglary in which the key evidence was a unique sole imprint left on the rear door of his former place of employment. Under the "probable cause" standard of *Texas,* or, for that matter, the "immediately apparent" standard of *Coolidge,* Hicks had sufficient knowledge to believe that the boots were evidence likely to be associated with criminal activity. Hence, he had a right to inspect them, and, if necessary, to seize them.

We further hold that Hicks had the right to turn over the boots and examine their soles. Clearly, defendant's privacy interest in the soles of his shoes is minimal. Other courts have

sensibly allowed this *de minimis* intrusion to investigate shoe-bottoms for their possible connection with footprints left at the scene of a crime. In *State v. Holloman,* 197 *Neb.* 139, 145, 248 *N.W.*2d 15, 19 (1976), the Supreme Court of Nebraska held that a police officer's action in lifting and turning over shoes that were in plain view was not unreasonable. The Michigan Supreme Court found a similar police inspection of shoe heels reasonable and therefore constitutional. *People v. Eddington,* 387 *Mich.* 551, 198 *N.W.*2d 297 (1972).

Upon examining the soles of defendant's work boots, Hicks noticed that the soles had a diamond shaped pattern consistent with those he recalled were stamped on the Madan door panel. Given that connection, Hicks was entitled to take the boots to headquarters to determine if the pattern matched the imprint on the door panel.[10] Despite the absence of a search warrant, the seizure and inspection of the boots was reasonable and constitutionally valid.

## V.

To summarize, we hold today that the proper standard for determining the constitutionality of a warrantless search-and-seizure is whether the police officer's conduct was objectively reasonable and in conformity with recognized exceptions to the warrant requirement. This assessment is to be made in light of the facts known to the officer at the time of the search. The execution of the arrest warrant at defendant's home, the accompaniment of defendant upstairs to his bedroom, and the inspection and seizure of defendant's boots all satisfy this objective standard. Accordingly, defendant's motion to suppress the boots was improperly granted. We therefore reverse the judg-

---

[10]In fact, had defendant chosen to *wear* the boots down to headquarters, the police would have had the authority to appropriate them from him temporarily for further investigation of his suspected involvement in the burglary. *See State v. Speciale,* 96 *N.J.Super.* 1, 6–7 (App.Div.), certif. den., 50 *N.J.* 291 (1967).

ment of the Appellate Division upholding the suppression order and remand the cause to the Law Division for proceedings not inconsistent with this opinion.

HANDLER, J., concurring.

I join in the Court's judgment in this case because I am satisfied that the arrest of the defendant was lawfully authorized, that the search undertaken by the police officers was incidental or ancillary to that arrest, and that the search itself was reasonably limited under all of the circumstances. I write separately because I am somewhat uncomfortable with the Court's expansive rationale to support the sound result that it reaches. I recognize the distinction that can be drawn as to searches that are "objectively" reasonable and "subjectively" unreasonable, e.g., State v. Guerra, 93 N.J. 146 (1983). However, I question the necessity and wisdom of applying it in this case.

I would be content to sustain the search substantially for the reasons expressed by Judge Milmed in dissenting from the judgment of the Appellate Division below. 187 N.J.Super. 435, 447 (App.Div.1982). It is undisputed that defendant was subject to a lawfully issued warrant for his arrest and that he was arrested under the authority of that warrant. This bedrock fact is accepted in each of the three opinions authored by the judges of the Appellate Division and is not challenged here by the dissenting opinion. Additionally, the police officers had the lawful authority to execute this arrest warrant and arrest the defendant at his home. Further, the execution of the arrest warrant, the actual arrest of the defendant, was reasonable: the police announced their presence, identified themselves, disclosed their purpose to make the arrest, permitted defendant to dress, and even, gratuitously, advised him of the bail he would have to meet in order to secure his release. In short, if the only thing that occurred in this case were the arrest of defendant, the validity of that police action would be incontestable.

The search that was conducted in connection with defendant's arrest was on any grounds—objective or subjective—totally unexceptional and reasonable. The police had the right to conduct a protective search to assure their own safety in the course of effecting the arrest. *State v. Smith,* 140 *N.J.Super.* 368 (App.Div.1976), aff'd *o.b.,* 75 *N.J.* 81 (1977). The police had the right to accompany the defendant when he went into his house, *Washington v. Chrisman,* 455 *U.S.* 1, 6–7, 102 *S.Ct.* 812, 816–17, 70 *L.Ed.2d* 778, 785 (1982), and to search the areas within defendant's immediate control. *Chimel v. California,* 395 *U.S.* 752, 89 *S.Ct.* 2034, 23 *L.Ed.2d* 685, reh. den., 396 *U.S.* 869, 90 *S.Ct.* 36, 24 *L.Ed.2d* 124 (1969).

Judge Milmed commented upon the testimony of the arresting officer, which was found by the trial court to be candid and honest, that *one* of the reasons for going to defendant's home was to execute the arrest warrant. 187 *N.J.Super.* at 449. Judge Milmed concluded that "Here, the clear objective of the police was to take defendant into custody on the outstanding arrest warrant, deliver him to Cranford pursuant thereto and 'talk to him' regarding the burglary at Madan Plastics. That 'technique' did not render the initial arrest on the warrant invalid nor any incriminating evidence properly resulting there-from inadmissible." *Id.* at 452–53 (citation omitted). I would underscore Judge Milmed's reference to the observation made in *United States v. Atkinson,* 450 *F.*2d 835, 840 (5th Cir.1971), *cert.* den., 406 *U.S.* 923, 92 *S.Ct.* 1790, 32 *L.Ed.2d* 123 (1972):

> This Court is well aware of the fact that police at times do arrest persons on one charge, primarily for the purpose of detaining them while building a case on another charge. We have held that such a technique does not cause the initial arrest, *if otherwise legitimate,* to become invalid, nor evidence resulting there-from to be necessarily inadmissible. [187 *N.J.Super.* at 453 n. 8 (emphasis added).]

Further, as Judge Milmed points out, the record in this case does not suggest that in going to defendant's home the police either planned to conduct a random search or did in fact conduct a random unlimited search. The undisputed, relevant circum-stances were that upon defendant's arrest on the warrant,

defendant chose to return to his room after being informed by the arresting officers that they would have to accompany him upstairs, and that in doing so the officers had a clear right to "monitor the movements" of the defendant and "to remain literally at [his] elbow at all times." *Washington v. Chrisman, supra,* 455 *U.S.* at 6–7, 102 *S.Ct.* at 816–17, 70 *L.Ed.2d* at 785.

The majority in this case obviously feels the decisional constraints cast by the plurality opinion of this Court in *State v. Ercolano,* 79 *N.J.* 25 (1979) and the majority opinion in *State v. Slockbower,* 79 *N.J.* 1 (1979). I find both cases distinguishable. In *Ercolano,* the plurality rejected the plain view search of defendant's automobile on the ground that the police improperly seized the car and consequently did not have the right to be in a position to have a view of the car's interior. 79 *N.J.* at 35. I disagreed with its perception of the factual circumstances surrounding the automobile search in that case, not with the general principle that if the police had no right to be where they were, they could not take advantage of the plain view doctrine. 79 *N.J.* at 71. The point to be made here is that legally and factually the police officers had the right to be where they were—in defendant's house effectuating a valid arrest warrant—and to seize any evidence of crime that was within their plain view.

I likewise find *State v. Slockbower* to be distinguishable. There the police arrested defendant on an outstanding warrant. The search that was thereafter conducted, involving the removal, impoundment and search of the vehicle, was not valid. Its invalidity, however, did not turn on the "pretextual" nature or illegality of the arrest, but simply upon the unreasonableness of the initial automobile search, *see, e.g., State v. Patino,* 83 *N.J.* 1 (1980), and the subsequent impoundment of the automobile, *see, e.g., State v. Mangold,* 82 *N.J.* 575 (1980). Thus, regardless of whether the arrest was made in good faith or not, the resultant automobile search was not sustainable. *Ibid.* Upon similar reasoning, *State v. Seiss,* 168 *N.J.Super.* 269 (App.Div.1979) is also distinguishable. There the search was invalid not because

the arrest made pursuant to an outstanding warrant was "pretextual" and therefore invalid, but because the ensuing search was not ancillary to that arrest; it clearly went beyond the bounds that confine a search incidental to a valid arrest. In this case, however, the search was clearly incidental to the arrest of the defendant. The arrest was based on lawful authority and serves as a valid predicate for the contemporaneous ancillary search.

Like reasoning impelled the dissent in *State v. Welsh,* 84 *N.J.* 346, 356 (1980) (Handler, J., dissenting), which considered the search in that case to be valid. The difference between the majority and dissent in *Welsh* was primarily factual rather than principled. The dissent believed, as did the majority, that the police had properly placed defendant under arrest. It was also of the view that by permitting the defendant to return to his automobile so he could drive it to police headquarters with his young son, the police were acting reasonably and responsibly in exercising custodial authority over the defendant. The majority did not share that view of those factual circumstances. However, upon the premise that custodial authority was being reasonably exercised, the search there undertaken was incidental to that procedure and was properly limited in its extent and duration. I am sure that if the majority of the Court in *Welsh* had been able to conclude that the custodial handling of the defendant were otherwise proper and reasonable, it would have sustained the search. Conversely, had the dissenters believed that either the arrest or the custodial treatment of defendant was invalid or unreasonable, they would have concluded, with the majority, that the resultant search would have been derivatively tainted.[1]

---

[1]The result in *State v. Welsh,* a four-to-three decision, has now been effectively superseded, *e.g., New York v. Belton,* 453 *U.S.* 454, 101 *S.Ct.* 2860, 69 *L.Ed.*2d 768 (1981); *see State v. Esteves,* 93 *N.J.* 498 (1983). Similarly, the search of the automobile upon the arrest of the defendant in *State v. Slock-*

Accordingly, I conclude that the principles to be invoked in this case are well established. The arrest was itself valid, the search was incidental to that valid arrest, and it was reasonably undertaken. For these reasons, I concur in the judgment of the Court.

Justice CLIFFORD joins in this concurring opinion.

POLLOCK, J., dissenting.

Succinctly stated, the issue in this case is whether the use of an arrest warrant as a pretext to search someone's home is reasonable under the New Jersey and United States Constitutions. *See U.S. Const.* amend. IV; *N.J. Const.* art. I, par. 7 (1947). The majority finds to be irrelevant the fact that the arrest warrant was used as a pretext. I respectfully disagree. The disagreement begins with a different perception of the facts.

I

At 10:30 a.m. on November 14, 1980, Joseph Bruzzese was asleep in his bedroom on the second floor of his home at 563 Westfield Avenue, Roselle Park. His aunt, Mrs. Schuha, who had raised him from infancy, was downstairs. The front doorbell rang, and when she opened the front door, she was confronted by Detective Hicks of the Cranford Police Department and Officer Mayer of the Roselle Police Department. Two more police officers, one from each department, were at the back door.

Without telling Mrs. Schuha of the reasons for their visit, Detective Hicks asked "to speak to Joe." While she went upstairs to defendant's bedroom, the officers remained downstairs in the living room.

---

*bower* would now be considered valid. *E.g., New York v. Belton, supra; see State v. Esteves, supra; State v. Alston,* 88 *N.J.* 211 (1981).

To justify the appearance of four police officers at the defendant's home, Detective Hicks volunteered on direct examination that the defendant had a history of violence. Because that assertion was unsubstantiated, the trial court immediately sustained a defense objection, and the State made no effort to substantiate the testimony. Consequently, at the conclusion of the suppression hearing, the trial court found that the police were not concerned either that the defendant would escape or that their personal safety was at risk.

The State asserts that the officers descended upon the defendant's home to serve an arrest warrant for failure to appear in municipal court in response to a summons for a minor offense, apparently a traffic violation.[1] That assertion is belied by several facts. Detective Hicks conceded that he did not ordinarily serve contempt warrants and that it would have been routine practice to call the defendant and tell him to come to police headquarters.

The actual reason for the appearance of the four police officers at defendant's home was that he was a suspect in a burglary that had occurred on November 12, 1980 at his former place of employment, Madan Plastics, Inc. Someone had kicked in a door and taken some tools; the perpetrator had left a diamond bootprint on the door panel. Detective Hicks stated that he wanted to talk to defendant "about the burglary and the fact that he was a suspect." The detective stated further that "in the back of my mind" was a desire to find out if defendant's bootprint matched the one on the door panel.

According to the police, the defendant had told friends, "he was going to get even with the people at Madan Plastics for firing him." Although suspicious, Detective Hicks did not apply

---

[1]Detective Hicks testified on cross-examination:

Q. Was it for not showing up for a traffic ticket or for what? Do you know?

A. I really don't know. I have a copy here. *I believe that's what it was.* It was contempt, failure to appear (emphasis added).

for a search warrant for defendant's home. Instead, he searched the records at the Cranford Police Department and discovered the outstanding warrant for defendant's failure to appear in municipal court.[2]

With respect to the service of the contempt warrant, Detective Hicks testified:

Q And that was the easiest way to gain access to his house; right?

A (No response.)

Q Right?

A It was the easiest way for us to pick him up and talk to him, yes.

When the defendant came downstairs, Detective Hicks informed him that the police officers were there "to pick him up on the (contempt) warrant." The officer advised him further that he would need $50 for bail. The defendant, who was barefoot and dressed only in a tee-shirt and slacks, told the police officers he would get dressed and accompany them to headquarters with the bail money. He asked the officers to wait downstairs, but Detective Hicks and Officer Mayer followed him upstairs to his bedroom. While the defendant was dressing, the detective poked around the bedroom, even looking under the bed and behind the TV.

Finally, the detective spotted a pair of boots under the dresser. He picked them up, turned them over and saw what appeared to be a print that matched the one on the back door of Madan Plastics. Although the detective seized the boots, he did not tell the defendant the reason for their confiscation until they interrogated him at police headquarters.

---

[2]Detective Hicks testified:

Q. Want [sic] occurred on this date with regard to the defendant?

\* \* \* \* \* \* \* \*

A. I had done some checking on the defendant to check on his past history. In doing so, I found that there was an active warrant in Cranford for contempt of court. I contacted Roselle Park Police Department, and I told them I'd like to go to his residence on North Avenue—or, Westfield Avenue, Roselle Park, and pick the defendant up on the warrant itself.

## II

On these facts, the majority finds valid as incident to a lawful arrest the search of a home and seizure of personal belongings. Unimportant to the majority are the facts that the officers never disclosed the investigative purpose for which they entered the defendant's home and that the police do not routinely serve contempt warrants. In addition, the majority finds to be irrelevant the service of the warrant as a pretext for gaining access to the defendant's home and his personal belongings.

I recognize that a search incident to a lawful arrest justifies a protective search of the person arrested and of the area within his immediate control. *Chimel v. California,* 395 *U.S.* 752, 763, 89 *S.Ct.* 2034, 2040, 23 *L.Ed.*2d 685 (1969). The limits of the "search incident to arrest" exception have been described:

> There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well recognized exceptions, may be made only under the authority of a search warrant. The 'adherence to judicial processes' mandated by the Fourth Amendment requires no less. [*Id.*].

In sustaining the search, the majority purports to adopt an "objective" analysis, the purpose of which is to avoid probing the psyche of the police when they make warrantless searches. Although an "objective" test has much to recommend it in many cases, like other rules of law, it has its own limits. In a case such as this, in which an arrest warrant is used as a pretext, the "objective" test can become an instrument of injustice. One need not engage in a debate on the relative merits of the "objective" or "subjective" approach, however, to form an opinion on the reasonableness of this search.

Furthermore, one need not necessarily probe an officer's state of mind to conclude that a search has been conducted for an improper purpose. In this case, for example, the police admitted that one purpose of the arrest was to gain access to defendant's home. By relying on the police officers' alleged fear for their safety, the majority ironically resorts to the officers' state of

mind to justify the conclusion that the search was reasonable. As indicated, however, the trial court rejected the testimony that the defendant had a history of violence.

In addition, the majority recognizes the difficulty of restricting a determination of reasonableness to "objective" facts and carves out an exception for the invasion of "the privacy of citizens as a means of racist or political harassment." *Ante* at 226. I join in condemning the use of an otherwise objectively valid search for such a purpose. Persecution of minorities, however, is not the only example of a warrantless search used for an invalid purpose. The present case provides another illustration.

Here, the majority relies on *Terry v. Ohio,* 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L.Ed.2d* 889 (1968), and *Scott v. United States,* 436 *U.S.* 128, 98 *S.Ct.* 1717, 56 *L.Ed.2d* 168 (1978). *Ante* at 219–220. *Terry* holds, however, that the good faith of an officer is not sufficient to justify a stop and frisk. In *Scott,* without looking into the state of mind of the officers who had intercepted telephone calls, the Court found wiretaps to be reasonable despite the government's lack of effort to minimize the intrusion. This ruling is of doubtful applicability to an arrest warrant used as a pretext for the physical invasion of a home and the seizure of personal belongings. *See* Burkoff, "Bad Faith Searches," 57 *N.Y.U.L.Rev.* 70 (1982); 1 LaFave, Search and Seizure § 1.2 (Supp.1983 at 14–16). Since *Terry* and *Scott,* moreover, the United States Supreme Court has repeated its warning that an arrest warrant may not be used as a pretext for searching a home. *See Steagald v. United States,* 451 *U.S.* 204, 215, 101 *S.Ct.* 1642, 1649, 68 *L.Ed.2d* 38 (1981).

Also distinguishable is *Washington v. Chrisman,* 455 U.S. 1, 102 *S.Ct.* 812, 70 *L.Ed.2d* 778 (1982), in which the Court allowed the seizure of marijuana seeds from a college student's dormitory room. In that case, having arrested the student for carrying a bottle of gin on campus, the officer waited in the doorway of the student's room while the student searched for his identifica-

tion. The officer had the right to remain at the student's elbow, *id.* at 6, 102 *S.Ct.* at 816, but he did not enter the student's room until he noticed marijuana seeds and a pipe. The seized evidence was in plain view and the arrest was not a device for gaining entry into the student's room. By contrast, in the present case the police used the contempt warrant as a pretext to accompany the defendant, search his bedroom, and seize his boots. Furthermore, the boots were not visible to the police until the search, and the soles were not apparent until after the seizure.

In *United States v. Villamonte-Marquez,* —— *U.S.* ——, 103 *S.Ct.* 2573, 77 *L.Ed.*2d 22 (1983), the Court held valid the seizure by custom officers of marijuana from a boat anchored in a ship channel. Pursuant to statutory authorization, the officers had boarded the vessel to examine the ship's papers. The Court, in sustaining the search, relied heavily on the vessel's ability to head for the open seas, an ability not shared by the defendant's home.

The majority bases its decision on both the Fourth Amendment of the United States Constitution and Article I, para. 7 of the New Jersey Constitution. In doing so, the majority recognizes "that this Court has the power to afford citizens of this State greater protection against unreasonable searches and seizures than may be required by the [United States] Supreme Court's prevailing interpretation of the Fourth Amendment." *Ante* at 216, n. 3 (citations omitted). The Court may find, as here, that an individual has no greater protection against government intrusion under the State Constitution than it concludes is afforded under the United States Constitution. The majority may not, however, deprive an individual of protection afforded by the United States Constitution. Hence, the majority's recital that it relies on federal cases only "for the purpose of guidance" need not preclude federal courts from concluding that the subject search and seizure transgresses the protection afforded an individual by the Fourth Amendment.

## III

Particularly troublesome is the approval by the majority of the invasion of a home, a place that is at the core of the United States and New Jersey Constitutions. A warrantless search and seizure inside a home is presumptively unreasonable. *Payton v. New York,* 445 *U.S.* 573, 586, 100 *S.Ct.* 1371, 1380, 63 *L.Ed.*2d 639 (1980); *see Coolidge v. New Hampshire,* 403 *U.S.* 443, 455, 91 *S.Ct.* 2022, 2032, 29 *L.Ed.*2d 564 (1971). The burden upon police officers to justify a warrantless search is heaviest when they seek to enter a suspect's residence. *State v. Ercolano,* 79 *N.J.* 25, 62 (Schreiber, J., dissenting).

An arrest warrant, particularly one for an unrelated minor offense, is not a substitute for a search warrant. The different functions of the two warrants have been described:

> An arrest warrant is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense and thus the warrant primarily serves to protect an individual from an unreasonable seizure. A search warrant, in contrast, is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place, and therefore safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police. [*Steagald v. United States; supra,* 451 *U.S.* at 213, 101 *S.Ct.* at 1648.]

A search warrant is not a mere formality; it is the only judicial checkpoint between the police station and the home. One crucial purpose of the warrant requirement is to require that the propriety of a search be evaluated by a neutral judicial officer, not a law enforcement officer, before the search occurs. *Johnson v. U.S.,* 333 *U.S.* 10, 13–14, 68 *S.Ct.* 367, 368–69, 92 L.Ed. 436 (1948).

In evaluating the conduct of the police in this case, the trial court stated: " . . . their entire conduct in entering this house, if limited to what they were there for, which was the contempt, would have and should have begun and ended with the defendant going upstairs, coming downstairs and going with them." Accordingly, the trial judge suppressed the boots as evidence.

In affirming, the Appellate Division stated:

We read the present record, and the conclusions of the trial judge, to establish that the seizure here was just such a 'planned warrantless seizure.' The police used a most anomalous procedure to effect an arrest in an adjoining town on a minor charge; an expressed reason for executing the contempt warrant by arrest was that defendant was a suspect in an entirely unrelated burglary and that 'we wanted to talk to him'; the officer 'had in the back of my mind' that he might find the footgear to match the only physical evidence he had from that burglary; at the time of the arrest there was no suggestion that defendant was angry or exercised, likely to become violent or to escape, and the police, without advising defendant of their plan to 'talk to him' concerning the burglary, followed him without invitation into his own bedroom where they made the hoped-for 'plain view' observation. Those facts fully support the finding of the trial judge that the arrest and seizure went well beyond what could reasonably be attributed to an intent to arrest defendant on a contempt warrant; in these circumstances the conduct of the police in arresting defendant and remaining at his elbow must realistically be seen as a pretext to obtain a view of the interior of his house and, as it fortuitously worked out, to make a 'plain view' seizure. This kind of improper police procedure was specifically envisioned in 'The Supreme Court, 1970 Term,' 85 *Harv.L.Rev.* 3 (1971):

> ... where the police have probable cause to arrest, their best strategy is to defer arrest until the suspect is at home so that they have a chance of discovering evidence in plain view which they would not have had if they made their arrest elsewhere. This use of the arrest power for the ulterior purpose of gaining access to a person's house amounts to a planned warrantless search and seems at the heart of Justice Stewart's concern. [*Id.* at 245] [187 *N.J.Super.* 435, 441–42 (1982)].

## The Appellate Division opinion continues by noting

that the intent of police officers may be determinative of the validity of their arrests and seizures and that the 'true facts' must prevail over the 'objective facts.' See State v. *Ercolano, supra,* 79 *N.J.* at 39.

In *Ercolano* the court held invalid what was claimed by the police to be an inventory search of an automobile. Judge Conford, speaking for the court, noted (at 38) that '[t]he intent and purpose of the police in conducting a search has frequently been held material to the validity thereof.' He recited with approval the holding of *Jones v. United States,* 357 *U.S.* 493, 500, 78 *S.Ct.* 1253, 1257, 2 *L.Ed.*2d 1514 (1958), that although government agents could lawfully have entered a house with intent to arrest a defendant and thereby legally seize illicit equipment in plain view, nevertheless the seizure there was invalid because the court found 'their purpose in entering was to search for distilling equipment and not to arrest petitioner'; therefore, Judge Conford recounted, '[t]he actual intent of the officers was regarded as fatal to the search as a matter of law.' 79 *N.J.* at 39. Based upon that and other authorities, Judge Conford found that 'the principle that the intent and purpose of the searching officers may be material, indeed crucial, to the validity of the search, is fully applicable here.' *Ibid.*

Similarly, in *State v. Slockbower, supra,* our Supreme Court found, as one ground for 'condemning' what was sought to be justified as an inventory search upon impoundment of an automobile, that 'the purported impoundment was pretextual' and therefore that there was not 'substantial necessity' for the impoundment. 79 *N.J.* at 13. And in *State v. Seiss, supra,* the conclusion that there was no 'substantial necessity' to enter defendant's house was based, as already recited, upon the court's finding that 'it appears the police invaded defendant's home merely for the purpose of conducting an exploratory search.' 168 *N.J.Super.* at 274–276. These cases are but exemplars of the broadly accepted view that 'bad faith' searches or seizures are unconstitutional even though they may appear to be objectively constitutional. See, generally, Burkoff, 'Bad Faith Searches', 57 *N.Y.U.L.Rev.* 70 (1982); Amsterdam, 'Perspectives on the Fourth Amendment,' 58 *Minn.L.Rev.* 349 (1974).

## II

Our finding of the invalidity of the alleged 'plain view' seizure is equally dispositive of the State's alternate contention that the seizure here was the product of a search incident to arrest. Not only did the officers testify that they did not conduct a search at all, but a search conducted upon the pretextual arrest would also be invalid under the authorities already cited. See, generally, Burkoff, 'Bad Faith Searches,' *supra.*

I agree. Not only does the majority reverse the lower courts in this case, but, in effect, it overrules two recent decisions of this Court, *State v. Slockbower,* 79 *N.J.* 1 (1979), and *State v. Ercolano,* 79 *N.J.* 25 (1979), and the decision of the Appellate Division in *State v. Seiss,* 168 *N.J.Super.* 269 (App.Div.1979).

A planned warrantless search and seizure is distinctly different from those situations where an officer must act on the spur of the moment. The solitary patrolman who stops and searches a suspicious vehicle bears little resemblance to a detective rummaging through records at police headquarters. Equally dissimilar is the policeman who apprehends the perpetrator in the commission of a crime. Here, the arrest warrant was sought, served, and used as a means of gaining access to the defendant's home and personal belongings. That is, a municipal court contempt warrant was used improperly as a substitute for a search warrant in the investigation of an unrelated burglary. The majority decision converts an arrest warrant for any offense, no matter how minor or unrelated, into a skeleton key for every suspect's home.

Like the majority, I accept the trial court's characterization that it was "a debatable question" whether the police had probable cause to search the defendant's home. The absence of probable cause does not, in my opinion, justify automatic recourse to an arrest warrant to make a pretextual search. On the other hand, if the police had probable cause, they also had time to obtain a search warrant. Here, the officers resorted to the arrest warrant because it was the "easiest way" to talk to the defendant and gain access to his home. Although I share the majority's concern about "the pervasiveness of dangerous criminal activity in our state today," *ante* at 232, the invalidation of this pretextual search would not impair efficient law enforcement, but it would preserve a paramount constitutional right.

I would affirm the judgment of the Appellate Division.

CLIFFORD and HANDLER, JJ., concurring in the result.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, O'HERN and GARIBALDI—6.

*For affirmance*—Justice POLLOCK—1.