**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0303-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JOHN L. HARRIS, a/k/a
JOHN STEVENSON,
LEROY J. HARRIS,
JOHN L. HARRIS III,
JOHN L. HARRIS 3RD, and
JOHNLEROY HARRIS,

     Defendant-Appellant.

_____

Submitted January 19, 2022 – Decided March 17, 2022

Before Judges Rothstadt and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment Nos. 18-05-0663 and 18-07-0925.

Joseph E. Krakora, Public Defender, attorney for appellant (Zachary Markarian, Assistant Deputy Public Defender, of counsel and on the briefs).

Scott A. Coffina, Burlington County Prosecutor, attorney for respondent (Nicole Handy, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Following an unsuccessful motion to suppress evidence obtained from a warrantless search, defendant John L. Harris pled guilty to a single offense of third-degree burglary, N.J.S.A. 2C:18-2(a)(1), charged in a twenty-two-count indictment. Defendant was thereafter sentenced in accordance with a plea agreement to an extended eight-year custodial term, subject to a four-year period of parole ineligibility. He now appeals his conviction and sentence.

Based on the proofs elicited at the suppression hearing, we conclude defendant was under arrest at the time of the warrantless search, and that search was properly conducted as a search incident to his arrest. We therefore affirm the denial of defendant's suppression motion, though for reasons slightly different than those expressed by the trial court. See State v. Heisler, 422 N.J. Super. 399, 416 (App. Div. 2011) (stating an appellate court is "free to affirm the trial court's decision on grounds different from those relied upon by the trial court"). We also find no error in the sentence imposed by the court.

I.

We begin with a summary of the facts derived from the suppression hearing. At 12:07 a.m. on February 9, 2018, Mount Holly Township police officers responded to Robin's Nest, a local restaurant, after a break-in alarm had sounded. Lieutenant (then Sergeant) James Harper, a twenty-three-year veteran of the department, testified that when he arrived at the scene at 12:22 a.m., three other patrolmen were already conducting an initial search of the restaurant. Once the owner arrived, the police were able to access the security camera system. The officers watched the footage and observed a suspect in the kitchen and behind the bar, seemingly searching for a cash register.

Lieutenant Harper explained that the surveillance video revealed a "medium height and build" suspect wearing a knit cap, a heavy black jacket with a hooded jacket underneath, "lighter-colored pants," and a "drawstring backpack with two fluorescent stripes angled on the side." He described the suspect's hat as a "beanie [with a] little puff on top" and "different levels of color." He testified that the video also showed the suspect "looking for a cash register" and taking "a bottle of alcohol on the way out."

At this point, Officer Tim Podeszwa, who watched a portion of the surveillance video, sent out a broadcast report with a description of the suspect

3

while the other officers worked to access and review additional video footage. The initial broadcast described the suspect as a white male, wearing a hoodie with a black jacket on top, and a black beanie-type hat and carrying a stringed backpack adorned with two florescent stripes.

At approximately 12:30 a.m., approximately thirty minutes after the alarm sounded, Officer Declan Deveney, who was on patrol in the area, observed defendant, a black male walking from the direction of Robin's Nest wearing clothing that matched the broadcast description. Officer Deveney also stated in his report that he was familiar with defendant from information "passed on from the detective bureau as he was a suspect in several commercial burglaries throughout the township." Before approaching defendant, however, Officer Deveney called Officer Podeszwa to confirm the suspect's race, to which Officer Podeszwa responded "it could possibly be a black male."

Shortly thereafter, Officer Deveney radioed Officer Tom Greenwich, also on patrol nearby, to stop defendant on the corner of King and Washington streets, which was approximately a five-minute walk from the Robin's Nest. Officer Podeszwa remained at the restaurant while Lieutenant Harper left to meet Officers Deveney and Greenwich, who stood with defendant in the parking lot of another nearby restaurant.

4

Defendant sat on the sidewalk speaking briefly with Officers Greenwich and Deveney until Lieutenant Harper arrived at approximately 12:45 a.m. with Officer Matthew Kline. Upon observing defendant, Lieutenant Harper testified that he noticed defendant's backpack matched the backpack visible in the surveillance video. He described defendant's backpack on the video as "a very unique drawstring bag, as it seemed to have two reflective stripes going . . . basically up to down and slashing out to the sides on an angle." He stated that he "observed the backpack that [defendant] was . . . wearing at that time was exactly like that backpack."

Lieutenant Harper further noted that defendant's height and build matched that of the suspect in the video, his "jacket and coat over [the] top of the jacket matched," and defendant also wore "light[] colored" jeans. Lieutenant Harper additionally observed that the suspect in the video was wearing boots and gloves, as was defendant.

Finally, Lieutenant Harper testified that he recognized defendant as "a subject [he was] familiar with" from other burglaries in town because he "had track fliers put out by the detective bureau that [defendant] was a suspect in several burglaries in our town." Lieutenant Harper also stated that defendant

5

was carrying a laptop bag, which he found to be "very significant" because he knew that laptops had been stolen during other recent burglaries.

Lieutenant Harper testified that after making these observations, and before speaking with defendant, he "believe[d] [defendant] was the suspect in the burglary from the Robin's Nest," and that he had sufficient evidence to arrest him. Body camera footage at the time, however, revealed Lieutenant Harper commenting that he did not believe he had "enough to prove he did my [breaking and entering]." Lieutenant Harper acknowledged this comment at the suppression hearing, but remained steadfast when testifying that based on all the circumstances, including the "clothing description, size and build, having a laptop, the flier that the suspect was a suspect in, numerous burglaries, [his location] two blocks away from the Robin's Nest in the less than [thirty] minute time period gave [him] enough" to take defendant into custody at that time.

Lieutenant Harper approached defendant and asked him about his whereabouts that night and the contents of his bag. Defendant told the officers that he had "just [been] dropped off," and was Ott's, a bar down the street. He then opened his drawstring backpack to show Lieutenant Harper the contents, revealing several cans of beer.

6

Lieutenant Harper then asked about the contents of defendant's laptop bag. Defendant opened the bag to reveal a laptop, trash bags, and an open bottle of Fireball whiskey. Lieutenant Harper performed a cursory search of the laptop bag, and defendant told the officers that he had carried the bottle of whiskey from his place of work in Philadelphia. Lieutenant Harper asked defendant, "Did you make a mistake tonight in going to the store down there, the Robin's Nest?" to which defendant responded "No, I went in Ott's and I came out of Ott's."

Lieutenant Harper then asked defendant if he was in possession of any weapons, such as a crowbar, and searched him, unzipping his jackets and searching through his pockets. After frisking defendant, Lieutenant Harper conducted a second, more thorough search of the laptop bag, unzipping an inner pocket. Lieutenant Harper testified that he did so to search for "proceeds of the burglary," but did not seize anything from the bag. In addition, Lieutenant Harper explained that he did not handcuff defendant because there were "sufficient officers on scene that [he] felt that it was safe." He further testified that at the time he looked through defendant's laptop bag, he was not free to leave.

A-0303-19

Lieutenant Harper and the other officers then checked whether defendant had any outstanding warrants and told him that once that process was complete, defendant could "get on [his] way." While awaiting the results of their inquiry, Lieutenant Harper and Officer Kline debated whether they had enough evidence to arrest defendant, with Lieutenant Harper stating, "we need to get this guy on something," and Officer Kline responded that he was confident defendant was the suspect shown on the surveillance video based on defendant's clothing matching the suspect on the tape.

Lieutenant Harper then received a call from Officer Podeszwa who informed him that officers at Robin's Nest had obtained additional security camera footage. Lieutenant Harper returned to Robin's Nest, leaving defendant with officers on the sidewalk for approximately twenty-five minutes, from 12:50 a.m. to 1:15 a.m., to allow him time to view the additional security footage. In this additional footage, the suspect's face was now clearly visible, unlike the prior clips that the officers had viewed.

Lieutenant Harper stated he observed the suspect climbing through the window and testified that after viewing the additional footage, he was able to identify defendant definitively based upon "the facial hair," "skin tone," and clothing defendant was wearing. He testified that this additional video, which

8

revealed defendant in Robin's Nest, provided additional evidence that established defendant's involvement in the robbery. He testified that he did not believe the new footage was necessary to effectuate defendant's arrest, as he already had sufficient information based upon his earlier observations.

Lieutenant Harper therefore returned to the sidewalk where officers were detaining defendant, formally arrested him, and brought him to the police station. At the police station, Lieutenant Harper searched defendant's coat, and found a "two-tone[d] stripe[d] hat" in the pocket that matched the hat in the surveillance footage. In defendant's laptop bag, he uncovered business cards from a surgical center that had recently been burglarized.

As noted, defendant moved to suppress the physical evidence from his backpack and laptop bag, which the court denied in a May 22, 2019 order and accompanying six-page written opinion. In its opinion, the court framed the issue as "whether [Patrolman] Deveney, in the first instance, had reasonable articulable suspicion to detain the defendant." The court noted that it excluded certain evidence from its consideration, including the description of the suspect's hat, because "defendant was wearing a different hat at the time he was stopped and detained." Nor did the court consider defendant's race or the officers' prior contact with him, characterizing those proofs as a "hunch." Finally, the court

excluded from its consideration the fact that defendant was in possession of a laptop, later discovered to be stolen, "because it was never a part of the broadcast description."

Even without this evidence, however, the court concluded the State had established a reasonable and articulable suspicion to conduct a <u>Terry</u>[1] stop based on the following factual findings:

> 1. The defendant's possession of a black backpack with two distinctive florescent stripes, one on each side - an identifying bullseye . . .
>
> 2. Defendant's clothing - a black jacket covering a hoodie jacket;
>
> 3. Defendant's proximity in time (about 40 minutes) and place (two blocks) from the scene of the burglary;
>
> 4. The time of day and the weather conditions, it being a cold night with no other pedestrians in the area as indicated by the officers' body-worn camera videos.

The court also held that the officers' forty-five-minute detention of defendant was not unreasonable and "was made in compliance with the dictates of <u>Terry</u>."  The court further concluded that the police took defendant into custody and "the ensuing pat-down and search of the defendant" was justified based on the officers' right to protect their own safety and obligation to preserve

---

[1]  <u>Terry v. Ohio</u>, 392 U.S. 1, 21-22 (1968).

A-0303-19

evidence.  Finally, the court held that the subsequent search warrant, that was later issued to search defendant's home, was based on probable cause and the evidence seized did not constitute "fruit of the poisonous tree."

At his plea hearing, defendant admitted to having entered into Robin's Nest on February 9, 2018 without permission and with the intent to steal money and a bottle of alcohol.  In exchange, the State agreed to dismiss the remaining counts of the indictment, as well as a separate burglary charge in a related indictment.  The State's plea agreement required defendant to serve a custodial term of eight years with a four-year period of parole ineligibility.

The third-degree crime to which defendant pled guilty carries an ordinary term of three to five years.  See N.J.S.A. 2C:43-6(a)(3).  As defendant had been previously convicted of various crimes, he was eligible for an extended term of imprisonment, see N.J.S.A. 2C:44-3(a), which increased his sentencing exposure from three to five years as a third-degree crime to five to ten years as a second-degree crime.  After the prosecutor explained the consequences of an extended term sentence, defendant agreed that he was so eligible, and the State accordingly requested that the court impose an eight-year term that would run concurrently to a separate Camden County matter.

11

The court sentenced defendant in accordance with the plea agreement and imposed applicable fines and penalties. In doing so, the court applied aggravating factors three, six and nine, N.J.S.A. 2C:44-1(3), (6), (9), based on defendant's "prior contact with the criminal justice system" and his criminal history, which "start[ed] in 1984 and continue[d] up until this present matter, which was in 2018." The court also reasoned that "[t]here is always a need, of course, to deter the general public and a specific need to deter," and found a need to deter defendant specifically because he had previously been sentenced "to fines and jail as well as state prison but that didn't fully deter him from his conduct." This appeal followed.

## II.

In defendant's first point, he argues the trial court erred in denying his motion to suppress and limiting the issue before it to whether the police had reasonable and articulable suspicion under <u>Terry</u>. Specifically, defendant maintains the court failed to make any findings as to probable cause or determine whether the search was incident to any arrest. He further contends police lacked probable cause to arrest him, and thus, the subsequent warrantless search was

12

unconstitutional as it did not satisfy the aforementioned exception to the warrant requirement.[2]

While we agree with defendant that the court did not analyze the point at which defendant was effectively under arrest and instead appears to have primarily analyzed the issue as whether the police officers' investigatory stop satisfied the requirements of Terry, we conclude that the search was appropriate as incident to an arrest. We reject defendant's arguments to the contrary.

When reviewing a decision on a motion to suppress evidence, appellate courts defer to the judge's factual findings "unless they [are] 'clearly mistaken' or 'so wide of the mark' that the interests of justice require[] appellate intervention." State v. Elders, 192 N.J. 224, 245 (2007). This deference is particularly appropriate when the court's factual findings are "substantially influenced by [its] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Reece, 222 N.J. 154, 166 (2015) (quoting State v. Locurto, 157 N.J. 463, 471 (1999)).

---

[2] We also note that defendant contends the warrantless search does not satisfy the protective search exception to the warrant requirement because there was no basis to believe defendant was armed or dangerous. Terry, 392 U.S. at 26-27; see also State v. Gamble, 218 N.J. 412, 430 (2014). We need not address this issue because the State does not attempt to justify the search as a protective search for weapons. Further, as noted, we find the warrantless search was proper as a search incident to arrest. See, infra, at pp. 17-18.

However, the motion judge's "legal conclusions reached from the established facts" are reviewed de novo, as the court's "application of the law is subject to plenary review on appeal." State v. Jefferson, 413 N.J. Super. 344, 352 (App. Div. 2010).

We agree with defendant that the issue before the court was not the propriety of the initial Terry stop, which defendant does not contest, but rather whether the police had probable cause to arrest him, thereby permitting a search of his backpack and laptop bag as a search incident to that arrest. To resolve the issue, we discuss well-settled constitutional principles.

The Fourth Amendment to the United States Constitution and Article I of the New Jersey State Constitution protect people from "unreasonable searches." U.S. Const. amend. IV; N.J. Const. art. I, § 7. The hallmark of these constitutional provisions is reasonableness. State v. Bruzzese, 94 N.J. 210, 217 (1983). A warrantless search is presumed to be unreasonable, and therefore invalid; "[h]ence, the State must prove the overall reasonableness and validity of [a warrantless] search." State v. Valencia, 93 N.J. 126, 133 (1983). A warrantless search may be found reasonable if the State proves, by a preponderance of the evidence, that the search falls within one of the "well-

delineated exceptions to the warrant requirement." Elders, 192 N.J. at 246 (quoting State v. Pineiro, 181 N.J. 13, 19 (2004)).

One of these exceptions is the "search incident to arrest" exception. State v. Hill, 115 N.J. 169, 173 (1989) (citing Chimel v. California, 395 U.S. 752 (1969)). "Under the search incident to arrest exception, the legal seizure of the arrestee automatically justifies the warrantless search of his [or her] person and the area within his [or her] immediate grasp." State v. Pena-Flores, 198 N.J. 6, 19 (2008), overruled on other grounds, State v. Witt, 223 N.J. 409, 450 (2015) (quoting Chimel, 395 U.S. at 762–63). "The purpose of such a search is (1) to protect the arresting officer[s] from any potential danger and (2) to prevent the destruction or concealment of evidence." State v. Dangerfield, 171 N.J. 446, 461 (2002). "[T]he ensuing search is valid even if there is no particular reason to believe that it will reveal evidence, contraband, or weapons." Pena-Flores, 198 N.J. at 19 (citing New York v. Belton, 453 U.S. 454, 461 (1990)).

Police may search a person incident to a lawful arrest grounded upon probable cause. "The probable-cause requirement is the constitutionally-prescribed standard for distinguishing unreasonable searches from those that can be tolerated in a free society." State v. Novembrino, 105 N.J. 95, 106 (1987).

A-0303-19

The standards for determining probable cause to arrest and probable cause to search are identical. State v. Smith, 155 N.J. 83, 92 (1998).

Our Supreme Court has stated that the probable cause standard "is not susceptible of precise definition." State v. Moore, 181 N.J. 40, 45 (2004) (citing State v. Wilson, 178 N.J. 7, 13 (2003)). Nevertheless, the Court has consistently held that probable cause means "less than legal evidence necessary to convict though more than mere naked suspicion [and it] exists if at the time of the police action there is a well[-]grounded suspicion that a crime has been or is being committed." Wilson, 178 N.J. at 13 (quoting State v. Sullivan, 169 N.J. 204, 210 (2001)).

Probable cause, however, "is not a stringent standard." State in Int. of J.G., 151 N.J. 565, 591 (1997). It does not require the suspicion that a crime has been or is being committed "be correct or more likely true than false." State v. Johnson, 171 N.J. 192, 207 (2002) (internal citation omitted). Rather, probable cause simply requires "a practical, common-sense decision whether, given all the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. at 214 (internal quotation marks and citation omitted).

A-0303-19

More specifically, "[p]robable cause exists where 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." State v. Harris, 384 N.J. Super. 29, 47 (App. Div. 2006) (quoting Moore, 181 N.J. at 46). When conducting a probable cause analysis, "courts must consider the totality of the circumstances, and they must deal with probabilities." Schneider v. Simonini, 163 N.J. 336, 361 (2000). "'[A]ll the definitions of probable cause [include] a reasonable ground for belief of guilt.'" Moore, 181 N.J. at 46 (2004) (quoting Maryland v. Pringle, 540 U.S. 366, 371 (2003)).

At the moment probable cause ripens, an officer is authorized to make an arrest and conduct a search of the defendant's person incident to that arrest. Dangerfield, 171 N.J. at 455–56. As the Court held in State v. O'Neal, "[w]hen the police search an individual before placing him [or her] under arrest 'as part of a single uninterrupted transaction, it does not matter whether the arrest precedes the search.'" 190 N.J. 601, 614 (2007) (quoting State v. Bell, 195 N.J. Super. 49, 58 (1984)). For a search to be justified as incident to a valid arrest, however, "there must have been an intention on the part of the officers to arrest

on the information possessed by them prior to the search, without regard to what the search might disclose." State v. Sims, 75 N.J. 337, 353 (1978).

Our Supreme Court has also explained that "'the proper inquiry for determining the constitutionality of a search-and-seizure is whether the conduct of the law enforcement officer who undertook the search was objectively reasonable, without regard to his or her underlying motives or intent.'" O'Neal, 190 N.J. at 613-614 (2007) (quoting Bruzzese, 94 N.J. at 219). While "an officer may testify to his or her subjective intent, the crucial inquiry is whether the officer's conduct was objectively reasonable." Ibid. In addition, "a subjective belief by the arresting officer cannot destroy probable cause where it exists." United States v. Anderson, 923 F.2d 450, 457 (6th Cir. 1991).

Defendant challenges Lieutenant Harper's search, arguing the police did not have probable cause or the "intention to arrest" him at the time of the search, and as such, the search of his backpack and laptop bag cannot be considered lawful as incident to his arrest. In support, he argues Lieutenant Harper did not in fact place him in handcuffs, or formally arrest him, until after he reviewed additional video footage from Robin's Nest. Defendant also argues Lieutenant Harper's comments provide further support that he believed he did not have probable cause to arrest defendant. We disagree with these arguments.

We review the search from an objective standpoint, O'Neal, 190 N.J. at 613-14, and consider the proofs known to Lieutenant Harper at the time he arrived at the sidewalk. Police stopped defendant late at night, within a two-block radius of the scene of the robbery, approximately thirty minutes after the alarm sounding. In addition, as Lieutenant Harper testified at the suppression hearing, defendant's height and weight matched that of the suspect on the surveillance video. Admittedly, the hat defendant wore when police stopped him was different than the hat seen in the video, but his general black coat and hoodie matched the footage. Though not dispositive, as it was winter, defendant was also wearing boots and gloves like the suspect in the video. Further, and most importantly, Lieutenant Harper observed that defendant's backpack had the distinctive reflective stripes that he had seen on the surveillance video.

These observations, in addition to Lieutenant Harper's familiarity with defendant as a suspect in nearby robberies, provided the objective "well-grounded suspicion" that defendant had committed the Robin's Nest robbery, Wilson, 178 N.J. at 13, justifying his arrest and a search incident to that arrest. As stated in O'Neal, even though the search preceded defendant's formal arrest, the "right to arrest pre-existed the search." 190 N.J. at 614.

We also note Lieutenant Harper's apparent subjective belief on February 9, 2018 that he "did not have enough" to arrest defendant and that officers needed to "get [defendant] on something" are not determinative to the analysis, see id. at 613-614, rather, as noted, the standard is whether the conduct of the police was objectively reasonable under the circumstances, and we conclude, based on the record, that it was. Likewise, the statements of Officer Kline expressing his subjective belief that defendant was the suspect, and thus ostensibly supporting probable cause, are similarly not dispositive. Accordingly, the search of defendant's bags was lawful.

III.

Defendant also argues his eight-year sentence with a four-year period of parole ineligibility must be vacated because "[a] sentence of eight years for a third-degree conviction is illegal." Relying upon State v. Smith, 372 N.J. Super. 539, 542 (App. Div. 2004), defendant further maintains that the fact that defendant's sentence resulted from a negotiated plea agreement is irrelevant, as parties cannot consent to an illegal sentence. Defendant also contends the court did not sufficiently explain the reasons for imposing an extended term, nor did it provide the basis for imposing a four-year period of parole ineligibility as required under State v. Kruse, 105 N.J. 354, 360 (1987).

A deferential standard applies when reviewing a trial court's sentencing decision. State v. Grate, 220 N.J. 317, 337 (2015); State v. Fuentes, 217 N.J. 57, 70 (2014). We must affirm a sentence unless: 1) the trial court failed to follow the sentencing guidelines; 2) the court's findings of aggravating and mitigating factors were not based on competent and credible evidence in the record; or 3) "the [court's] application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience." Fuentes, 217 N.J. at 70 (second alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)). Moreover, the deferential standard of review only applies "if the trial judge follows the Code and the basic precepts that channel sentencing discretion." State v. Case, 220 N.J. 49, 65 (2014).

With respect to defendant's argument that his sentence is illegal, we find no error in the court's decision to impose the discretionary extended term under the plea agreement. N.J.S.A. 2C:44-3(a) permits a sentencing court to sentence a defendant as a "persistent offender" to an extended term of imprisonment "when the defendant was convicted of at least two separate prior crimes but only if 'the latest' of those crimes was committed or the defendant's 'last release from confinement occurred' – 'whichever is later' – within ten years of the charged crime." State v. Clarity, 454 N.J. Super. 603, 606 (2018) (quoting N.J.S.A.

A-0303-19

2C:44-3(a)).  Under the statute, a defendant must have also been at least twenty-one years old when he or she committed the crime to be sentenced and must have been at least eighteen years old when he or she was convicted of the two prior offenses.  N.J.S.A. 2C:44-3(a).

The persistent offender statute "grants the sentencing court discretion to impose an extended sentence when the statutory prerequisites for an extended-term sentence are present."  State v. Pierce, 188 N.J. 155, 161 (2006).  A defendant's prior convictions alone expose the defendant to the maximum sentence within the extended term range, and a court may not engage in additional fact finding in support of an extended sentence.  Id. at 168.

After determining a defendant's eligibility for an extended term under the statute, the court must next determine whether to impose an extended sentence.  Then, the court must "weigh the aggravating and mitigating circumstances to determine the base term of the extended sentence."  Id. at 164 (quoting State v. Dunbar, 108 N.J. 80, 89 (1987)).  The range of available sentences "starts at the minimum of the ordinary-term range and ends at the maximum of the extended-term range."  Id. at 169.  The decision to sentence a defendant within this range lies within "the sound judgment of the court—subject to reasonableness and the existence of credible evidence in the record to support the court's finding of

aggravating and mitigating factors." Ibid. Finally, the court "must determine whether to impose a period of parole ineligibility." Id. at 164.

We are satisfied the court made the necessary findings and found the extended term appropriate based upon defendant's extended criminal history. Here, defendant satisfied all conditions precedent for an extended term under N.J.S.A. 2C:44-3(a). From the age of forty-three, and beginning in 2010, defendant had been convicted of four crimes, including fourth-degree theft, second-degree burglary, fourth-degree criminal attempt to commit theft, and third-degree receiving stolen property. At sentencing, defense counsel did not challenge the prior convictions relied upon by the State and the court to establish defendant's status as a persistent offender. Moreover, "[c]onsidering the relative weight, severity, and similarity of the prior offenses," we find no fault with the trial judge's decision to impose the sentence as a persistent offender, consistent with the plea agreement. Dunbar, 108 N.J. at 96.

In addition, contrary to defendant's argument that the court did not sufficiently explain its imposition of a sentence in the extended term range, the record reveals the court reviewed the terms of the extended sentence with defendant during the plea agreement. The State correctly and carefully explained to defendant the implications of an extended term and why he was

eligible.  The court also questioned defendant extensively as to his understanding of the extended sentence and defendant twice stated that he understood.

We also disagree that the court committed any error in imposing a four-year period of parole ineligibility and we are satisfied that the sentencing court properly weighed the aggravating factors against the non-existent mitigating factors.  Under Kruse, 105 N.J. at 362, our Supreme Court emphasized that where parole ineligibility is imposed, the trial court should "state the reasons for the sentence, indicating why it is clearly convinced that the aggravating substantially outweigh the mitigating factors," but "[w]ithout such a finding, a court's calculation of parole eligibility should follow the statutory scheme."

In turn, parole ineligibility is addressed in N.J.S.A. 2C:43-6(b), which provides that "the court may fix a minimum term not to exceed one-half of the term set pursuant to subsection a., [providing maximum terms for first-, second- and third-degree crimes] . . . during which the defendant shall not be eligible for parole" where the court is "clearly convinced that the aggravating factors substantially outweigh the mitigating factors."  Our Supreme Court has held, however, that "[p]eriods of parole ineligibility are the exception and not the rule

24

[and] [t]hey are not to be treated as routine or commonplace." <u>Kruse</u>, 105 N.J. at 359 (quoting <u>State v. Martelli</u>, 201 N.J. Super. 378, 382-83 (App. Div. 1985)).

At sentencing, the State argued for aggravating factors three, six, and nine. The State emphasized that defendant posed an "extremely high" risk of recidivism, and he had an extensive criminal record, "almost all for burglary." The State also pointed out the need for deterrence, given defendant's "virtual crime spree," which encompassed the numerous counts under the indictment. Defense counsel did not argue for the application of any mitigating factors and requested only that the court sentence defendant in accordance with the plea agreement.

As noted, the court thoroughly expressed its reasons for applying aggravating factors three, six, and nine, and stated that it found these factors to outweigh any mitigating factors after considering them on a "qualitative as well as a quantitative basis." The court noted that it had incorporated the arguments of counsel and referred to the presentence report. The court also considered the nature of the crime and found that the plea agreement was fair and in the interests of justice.

We are therefore satisfied that the court has complied with the constraints of <u>Kruse</u>, 105 N.J. at 362, and its analysis indicates it was "clearly convinced

25

that the aggravating substantially outweigh[ed] the mitigating factors." We also conclude that defendant's four-year period of parole ineligibility follows the statutory requirements of N.J.S.A. 2C:43-6(b), as it does not exceed one-half the full custodial term. The sentence imposed in this case—which is above the mid-point of the second-degree sentencing range but below the upper limit of that range—comports with the Code of Criminal Justice and does not "shock [our] judicial conscience." See Roth, 95 N.J. at 364-65.

To the extent we have not specifically addressed any of defendant's arguments, it is because we have considered those contentions of insufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0303-19